866 A.2d 270

**BILT–RITE CONTRACTORS, INC., Appellant**

**v.**

**THE ARCHITECTURAL STUDIO, Appellee.**

Supreme Court of Pennsylvania.

Argued Dec. 4, 2002.

Decided Jan. 19, 2005.

Mason Avrigian, Jr., Blue Bell, for Bilt–Rite Contractors, Inc., appellant.

Maura Zajac McGuire, Nicholas Noel, Easton, for The Architectural Studio, appellee.

Before: CAPPY, C.J., CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## *OPINION*

Justice CASTILLE.

This appeal raises the first impression question of whether a building contractor may maintain a negligent misrepresentation claim against an architect for alleged misrepresentations in the architect's plans for a public construction contract, where there was no privity of contract between the architect

and the contractor, but the contractor reasonably relied upon the misrepresentations in submitting its winning bid and consequently suffered purely economic damages as a result of that reliance. The Superior Court found as a matter of law that, absent privity of contract, the contractor could not maintain such a tort action against the architect. For the reasons that follow, we reverse the order of the Superior Court and remand to the trial court for further proceedings.

Because this Court sits in review of the trial court's grant of appellee's preliminary objections in the nature of a demurrer, the salient facts are derived solely from the allegations in appellant's complaint. In such an instance, all material facts as set forth in the complaint, as well as all inferences reasonably deducible therefrom, must be accepted as true. *Estate of Witthoeft v. Kiskaddon,* 557 Pa. 340, 733 A.2d 623, 624 n. 1 (1999). The facts are as follows: East Penn School District entered into a contract with appellee, The Architectural Studio ("TAS"), pursuant to which TAS provided architectural services for the design and construction of a new school in Lower Macungie Township, Lehigh County. The services included the preparation of plans, drawings and specifications to be submitted to contractors for the purpose of preparing bids for the construction of the new school. In February of 1997, the school district solicited bids from contractors for all aspects of the project and included TAS's plans, drawings and specifications in the bid documents supplied to the contractors. Appellant, Bilt–Rite Contractors, Inc. ("Bilt–Rite"), submitted its bid for general construction work on the project and on May 6, 1997, the school district awarded the general construction contract to Bilt–Rite, who was the lowest responsible bidder. On June 6, 1997, the school district and Bilt–Rite entered into a contract for the project in the base amount of $16,238,900. The contract specifically referred to, and incorporated by reference, TAS's plans, drawings and specifications.

TAS's plans provided for the installation of an aluminum curtain wall system, sloped glazing system and metal support systems, all of which TAS expressly represented could be

installed and constructed through the use of normal and reasonable construction means and methods, using standard construction design tables. Once construction commenced, however, Bilt–Rite discovered that the work including the aluminum curtain wall, sloped glazing and metal support systems could not be constructed using normal and reasonable construction methods, and instead required Bilt–Rite to employ special construction means, methods and design tables, resulting in substantially increased construction costs.

On November 19, 1999, Bilt–Rite sued TAS on a theory of negligent misrepresentation under Section 552 of the Restatement (Second) of Torts, claiming that TAS's specifications were false and/or misleading, and seeking damages for its increased construction costs.[1] On December 9, 1999, TAS filed

---

1. Section 552, which is entitled "Information Negligently Supplied for the Guidance of Others," provides:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
>
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

Liability under Subsection (3), according to the Comment, typically would apply to a public officer who, by his acceptance of his office, has undertaken a duty to the public to furnish information of a particular kind. For example, this subsection would apply to a recording clerk, notary public or government food inspector. It may also apply to nongovernment entities who are required by law to provide information for the protection of segments of the population like insurance companies who must file certain financial information with the insurance commissioner, which information may be relied upon by potential insureds.

preliminary objections in the nature of a demurrer, arguing that: (1) Bilt–Rite's action was barred by the "economic loss doctrine," which holds that a tort plaintiff cannot recover for purely economic losses; and (2) TAS owed no duty to Bilt–Rite, with whom it had no contractual relationship. On June 22, 2000, the trial court sustained TAS's preliminary objections and dismissed Bilt–Rite's complaint.

The trial court deemed itself bound by the Superior Court's decision in *Linde Enterprises, Inc. v. Hazelton City Authority,* 412 Pa.Super. 67, 602 A.2d 897 (1992), *appeal denied,* 533 Pa. 601, 617 A.2d 1275 (1992), which, the court noted, held that a contractor cannot prevail against an architect for economic damages suffered as a result of negligence in drafting specifications, absent privity of contract between the contractor and the architect. Slip op. at 2 n. 1. The trial court found further support for its decision in *Palco Linings, Inc. v. Pavex, Inc.,* 755 F.Supp. 1269 (M.D.Pa.1990). In *Palco,* the district court, which was applying Pennsylvania law in a diversity action, addressed the operation of the economic loss rule in actions involving negligent misrepresentation. *Palco* noted that the economic loss rule reflects the concern that tort law (unlike contract law) is not generally intended to compensate parties for losses suffered as a result of a breach of duties which are assumed only by agreement; to recover in tort, there must be a breach of a duty of care imposed by law and a resulting injury. 755 F.Supp. at 1271. Looking to Illinois cases for persuasive authority, the *Palco* court suggested two viable exceptions to the economic loss rule in negligent misrepresentation cases: (1) where the defendant intentionally makes a false misrepresentation; and (2) where the defendant is in the business of supplying information for the guidance of others and makes negligent misrepresentations. The *Palco* court found that neither exception should apply to architects sued in their capacity as design professionals. *Id.* at 1274.

Following its discussion of *Linde* and *Palco,* the trial court noted that, although Pennsylvania courts have cited Section

Subsection (3) is not at issue in this case and we offer no view on whether it has any place in Pennsylvania law.

552 of the Restatement (Second) with approval, no court had held that it permitted such a cause of action against a design professional. The trial court found that Bilt–Rite's action did not fall into either of the exceptions outlined in *Palco,* and therefore, Bilt–Rite had failed to set forth a viable Section 552 cause of action against TAS.

On Bilt–Rite's appeal, the Superior Court affirmed in an unpublished decision. The panel noted that the absence of privity is not an absolute bar to recovery for economic damages in tort; however, the question of which business relationships should be deemed exempt from the privity requirement (and thus exempt from the economic loss rule) must be decided on a case-by case basis. The panel further noted that the architect-contractor relationship had never been expressly included or excluded from the reach of Section 552. Therefore, the panel reasoned, its "review is guided by the principle that the tort of negligent misrepresentation, like the [sic] any action in negligence, requires the existence of a duty owed by one party to another." Slip op. at 9, *citing, inter alia, Bortz v. Noon,* 556 Pa. 489, 729 A.2d 555, 561 (1999) and *Gibbs v. Ernst,* 538 Pa. 193, 647 A.2d 882, 889 (1994). The question then became whether, as a matter of law, an architect such as TAS who prepares and develops design drawings and specifications, owes a duty to the contractors who apply those specifications in the situation where no contractual relationship exists. The panel recognized that question was controlled by *Linde;* since Bilt–Rite enjoyed no privity of contract with TAS, TAS owed it no duty, and Bilt–Rite could not proceed upon its negligent misrepresentation claim.

This Court granted further review because the question of the viability of a negligent representation tort action in the architect/contractor/no privity scenario is one of first impression for this Court; the question has split other state courts and the federal courts, *see Linde,* 602 A.2d at 901(discussing competing authority); and the question has split the lower federal courts in Pennsylvania, attempting to predict how this Court would rule on the question in light of our previous applications of Section 552. *Compare Palco, supra*

with *Borough of Lansdowne v. Sevenson Env. Services,* 2000
WL 1886578 (E.D.Pa.2000), at \*4–\*5 (unpublished memoran-
dum by Weiner, J.). The question of the reach and scope of
the action is a pure question of law; as such, this Court's
review is plenary. *E.g. MCI WorldCom, Inc. v. Pennsylvania
Public Utility Comm'n,* 577 Pa. 294, 844 A.2d 1239 (2004).
Further, "the standard of review for preliminary objections in
the nature of a demurrer is limited; the question presented by
the demurrer is whether, on the facts averred, the law says
with certainty that no recovery is possible. Where a doubt
exists as to whether a demurrer should be sustained, this
doubt should be resolved in favor of overruling it." *MacElree
v. Philadelphia Newspapers, Inc.,* 544 Pa. 117, 674 A.2d 1050,
1056 (1996) (quoting *AM/PM Franchise v. Atlantic Richfield,*
526 Pa. 110, 584 A.2d 915, 921 (1990)). Thus, this Court is
charged with deciding whether, under the facts alleged in
Bilt–Rite's complaint, tort recovery is possible under Pennsyl-
vania law.

Citing *Rempel v. Nationwide Ins. Co.,* 471 Pa. 404, 370 A.2d
366 (1977) (plurality opinion) and *Gibbs v. Ernst, supra,* Bilt–
Rite argues that this Court has recognized the tort of negli-
gent misrepresentation and, in so doing, has approved the
Restatement (Second) Section 552 formulation of the action.[2]
Bilt–Rite further argues that, when this Court has set forth
the elements of the negligent misrepresentation action (rely-
ing upon the Restatement for those elements), it has not
included contractual privity. Instead, Bilt–Rite argues, this
Court has focused on whether there was reliance upon the
misrepresentations and the foreseeability of that reliance.
Bilt–Rite argues that the focus on foreseeability, rather than
privity, is sensible because it is "the foreseeability of one party
using and relying upon the misrepresentations of another
which creates the duty." Brief for Appellant, 13.

**2.** Appellant fails to note that *Rempel* was a plurality opinion, and thus,
it lacks precedential value. Moreover, although both *Rempel* and *Gibbs*
cite Section 552 with approval in discussing the tort of negligent
misrepresentation, neither involved the architect/contractor scenario.

Bilt–Rite posits that the school district hired TAS to pre-
pare plans, drawings and specifications with the intention of
conveying those documents to contractors for purposes of
bidding; in fact, the sole purpose of the design documents was
for their use by contractors in the bidding process.[3]  Bilt–Rite
argues that TAS knew that contractors would rely upon its
designs and specifications in submitting bids and yet failed to
exercise reasonable care in preparing those documents.  Since
Bilt–Rites reliance on the designs was both justifiable and
foreseeable, Bilt–Rite argues, its complaint falls squarely with-
in Section 552.

In further support of its construction of Section 552, Bilt–
Rite notes that Comment h and Illustration 9 to comment h of
Section 552 exactly describe this case.  Comment h provides
in pertinent part:

> h.  *Persons for whose guidance the information is sup-
> plied.*  The rule stated in this Section subjects the negligent
> supplier of misinformation to liability only to those persons
> for whose benefit and guidance it is supplied.  In this
> particular his liability is somewhat more narrowly restricted
> than that of the maker of a fraudulent representation (see
> § 531), which extends to any person whom the maker of the
> representation has reason to expect to act in reliance upon
> it.
>
> Under this Section, as in the case of the fraudulent misrep-
> resentation (see § 531), it is not necessary that the maker
> should have any particular person in mind as the intended,
> or even the probable, recipient of the information.  In other
> words, it is not required that the person who is to become
> the plaintiff be identified or known to the defendant as an
> individual when the information is supplied.  It is enough
> that the maker of the representation intends it to reach and
> influence either a particular person or persons, known to
> him, or a group or class of persons, distinct from the much
> larger class who might reasonably be expected sooner or

**3.**  Pennsylvania law required the school district to provide the design
information to contractors in order to solicit bids and then award
contracts to the lowest responsible bidders.  *See* 24 P.S. § 7–751.

later to have access to the information and foreseeably to take some action in reliance upon it. It is enough, likewise, that the maker of the representation knows that his recipient intends to transmit the information to a similar person, persons or group. It is sufficient, in other words, insofar as the plaintiff's identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given. It is not enough that the maker merely knows of the ever-present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.

Illustration 9 then sets forth a specific example regarding bids for a government construction contract:

9. The City of A is about to ask for bids for work on a sewer tunnel. It hires B Company, a firm of engineers, to make boring tests and provide a report showing the rock and soil conditions to be encountered. It notifies B Company that the report will be made available to bidders as a basis for their bids and that it is expected to be used by the successful bidder in doing the work. Without knowing the identity of any of the contractors bidding on the work, B Company negligently prepares and delivers to the City an inaccurate report, containing false and misleading information. On the basis of the report C makes a successful bid, and also on the basis of the report D, a subcontractor, contracts with C to do a part of the work. By reason of the inaccuracy of the report, C and D suffer pecuniary loss in performing their contracts. B Company is subject to liability to C and to D.

Bilt–Rite avers that Comment h proves that the tort does not include a privity requirement, but rather, contemplates that the plaintiff may be a member of a group or class of persons for whose use the defendant supplies the information. Bilt–Rite also argues that Illustration 9 demonstrates that design professionals such as TAS should be deemed subject to liabili-

ty to contractors like Bilt–Rite for negligent misrepresentations in their design documents.

Bilt–Rite also submits that the Superior Courts own precedent does not require privity of contract in a negligent misrepresentation action and that federal district courts applying Pennsylvania law, as well as courts in other jurisdictions, have permitted contractors to maintain negligent misrepresentation claims against design professionals without requiring privity. Indeed, Bilt–Rite notes, a majority of the jurisdictions to consider the question have not required contractual privity. Finally, Bilt–Rite claims that the Superior Court's reliance upon its precedent in *Linde* was misplaced because *Linde* involved a general negligence claim, not a negligent misrepresentation claim, which is distinctly different. In Bilt–Rite's view, the economic loss rule does not bar the claim *sub judice* because negligent misrepresentation is a recognized exception to the economic loss doctrine.

TAS's response mirrors the reasoning of the courts below. Advancing a more traditional view of tort law, TAS responds that the economic loss doctrine precludes causes of action based upon negligence or negligent misrepresentation where the plaintiff claims only economic loss and the parties are not in privity of contract. TAS argues that the doctrine applies to services rendered by design professionals, and Pennsylvania courts and federal courts in Pennsylvania have held that design professionals cannot be held liable for purely economic losses to a party with whom they share no contractual relationship. TAS further argues that Section 522 should be construed as inapplicable to cases involving design professionals, and cites as support the Pennsylvania state and federal cases relied upon below, which have declined to apply Section 552 to design professionals absent privity. TAS argues that all of the cases relied upon by Bilt–Rite to reach a contrary conclusion involve professions other than design professions.

The trio of cases that comprise this Court's recent jurisprudence on the negligent misrepresentation tort provide little guidance in resolving the specific issue in this appeal. *Bortz v. Noon, supra*, relied upon by the Superior Court, involved a

real estate agent who allegedly failed to disclose to buyers that the septic system on the property the buyers were purchasing had not passed a dye test intended to show whether the system was functioning properly. After the septic system failed an initial dye test, the sellers' real estate agent informed the buyers that the sellers would repair the system and had retained a contractor to perform repairs. Settlement on the property was delayed until the repairs were completed and the system passed a dye test. Approximately one month after the initial failed dye test, a representative of the title company involved in settlement informed the real estate agent that the system had passed a new dye test, and the agent relayed that information to the buyers. Neither the agent nor the buyers reviewed any written report. On the day of settlement, the proceedings were delayed because, according to the real estate agent, the county was inspecting the work on the septic system. During the actual settlement, the title company's representative told everyone present, including the real estate agent and the buyers, that the system had passed the dye test.

After settlement, the buyers discovered that the septic system had not passed a dye test. The system was retested and failed, forcing the buyers to connect to the public sewer system at a cost of $15,000. The buyers filed an equity action against the real estate agency, the title company, and the contractor who repaired the septic system, seeking monetary damages and rescission of the sale. The chancellor denied rescission, granted judgment against the real estate agency in the amount of $15,300, and held that neither the title company nor the contractor were liable as they owed no duty to the buyers.

On appeal, the Superior Court affirmed the judgment against the real estate agency, but reversed the finding in favor of the title company and the contractor, holding that both could be liable to the buyers for negligent misrepresentation. This Court granted allocatur limited to the question of whether the real estate agent had a duty to ascertain that the septic system had actually passed a dye test and whether her

failure in this regard constituted a misrepresentation to the buyers. In distinguishing the tort of negligent misrepresentation from intentional misrepresentation, we stated:

Negligent misrepresentation requires proof of: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation. *See, e.g., Gibbs,* 538 Pa. at 210, 647 A.2d at 890, *citing,* Restatement (Second) Torts 552. The elements of negligent misrepresentation differ from intentional misrepresentation in that the misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words. *Id.* Moreover, like any action in negligence, there must be an existence of a duty owed by one party to another. *Id.*

*Bortz,* 729 A.2d at 561. Although this Court acknowledged Restatement Section 552 through the citation to *Gibbs,* we did not purport to adopt Section 552 as a matter of Pennsylvania law. Indeed, the elements of negligent misrepresentation that this Court set forth in the *Bortz* decision are not identical to Section 552's elements.

The *Bortz* Court concluded that there was no special relationship among the buyers, the agent, the contractor or the title company that would require the real estate agent to engage in an investigation regarding the dye test. Further, we determined that the agent was not in a superior position to the buyers in terms of verifying that the system had passed the dye test. In addition to finding that the agent owed no duty to the buyers, we held that she had no duty to make an independent investigation of the contractor's report because she had no contractual or agency relationship with the contractor.

*Gibbs v. Ernst, supra,* considered the issue of negligent misrepresentation in the distinct context of adoption. The Gibbs had adopted a child whom the adoption agency repre-

sented to be a five-year-old boy who had been verbally abused and neglected by his mother. (It turned out the child was actually seven-years-old at the time.) The Gibbs had specifically informed the agency that they wanted to adopt a child who had no history of physical or sexual abuse or any mental or emotional problems. During the nine months between the placement of the child with the Gibbs and the finalization of the adoption, the Gibbs repeatedly asked the adoption agency if there was any information about the boy that had not been disclosed to them. They were assured that they had been provided everything that the county's Children and Youth department had given to the agency. Immediately after the adoption was final, the child began to reveal severe emotional problems, becoming violent and aggressive toward younger children.[4] After inpatient evaluations at two different institutions, the child was transferred by court order to Eastern State School and Hospital, declared dependent by the court, and placed in the custody of Philadelphia's Department of Human Services (DHS).

Shortly after DHS acquired custody, and nearly four years after the adoption was finalized, the Gibbs learned for the first time that the boy had been severely sexually and physically abused and neglected by his biological parents, that he had been in ten different foster homes during his first six years, that he had an extensive history of aggression and hostility towards other children, and that his biological mother had once attempted to sever a body part. Both Children and Youth and the adoption agency had all of this information in their possession prior to the finalization of the adoption, yet they failed to disclose it even though the Gibbs had specifically requested any negative information.

The Gibbs sued the adoption agency and Children and Youth in the Court of Common Pleas of Bucks County, alleging wrongful adoption and negligent placement of an

4. For example, the child attempted to amputate a five-year-old's arm, to suffocate a younger cousin, and to kill another cousin by hitting him over the head with a lead pipe. He also deliberately placed Clorox bleach in a cleaning solution, causing Mrs. Gibbs to burn her hands badly, and started a fire, seriously injuring a younger cousin.

adoptive child. The defendants filed preliminary objections in the nature of a demurrer, which the trial court granted. The Commonwealth Court reversed, *Gibbs v. Ernst*, 150 Pa. Cmwlth. 154, 615 A.2d 851 (1991), and this Court granted further review of the viability of the Gibbs' tort action.

This Court first determined that the Gibbs' complaint did not set forth novel theories of recovery, but rather advanced claims cognizable under long-standing common law pertaining to intentional and negligent misrepresentations. We noted that "Pennsylvania has long recognized the common law tort of negligent misrepresentation," citing to cases from federal district and bankruptcy courts in Pennsylvania and our Superior Court. *Gibbs*, 647 A.2d at 891. In analyzing the negligent misrepresentation claim presented, we set forth the elements quoted later in the *Bortz* opinion and also cited to Section 552 with approval, albeit this Court did not explicitly state that it was adopting the Section 552 formulation as a matter of Pennsylvania tort law. The *Gibbs* Court emphasized, as the *Bortz* Court did, that "[a]ny negligence action is premised on the existence of a duty owed by one party to another." *Id.* at 890. Recognizing that foreseeability is an important element of duty, we held that an adoption agency could only be liable to adoptive parents for those conditions reasonably foreseeable at the time of placement. Because the Gibbs had alleged that the adoption agency should have known that the affirmative representations it had made to the Gibbs regarding the boys past were false, this Court found that the Gibbs had stated a viable cause of action for negligent misrepresentation that should be permitted to proceed to trial.

This Court's plurality opinion in *Rempel v. Nationwide Ins. Co., supra,* involved alleged negligent misrepresentations made by an insurance agent. There, the plaintiff and her husband had purchased a thirty-year mortgage protection policy on the husbands life through a Nationwide agent. In the event of the husband's death, the policy was to pay any outstanding mortgage balance on the Rempels' home. Shortly after purchasing the policy, the plaintiff contacted the Nationwide agent to inquire whether Nationwide could match a

policy offered by a competing insurer that would provide the same mortgage protection plus $5,000 in life insurance protection for a few dollars more per month. The agent consulted with Nationwide and then informed the plaintiff that Nationwide would provide a $5,000 whole life policy with a twenty-year family income rider, which would offer the same protection as the competing insurers policy for a few dollars per month over the cost of the original policy. Plaintiff and her husband opted to stay with Nationwide and take the new coverage and, thereafter, paid the premiums until nine years later when the plaintiff's husband died.

After her husband's death, the plaintiff telephoned the Nationwide agent who informed her that the policy would pay her approximately $16,000, representing the $11,100 outstanding mortgage balance plus the $5,000 life insurance benefit. A few days later, however, the agent advised the plaintiff that the policy would pay her only a lump sum of $10,430. The plaintiff sued Nationwide and its agent, contending that the agent had either negligently or fraudulently misrepresented that the policy he sold them would pay the outstanding mortgage balance plus $5,000 of life insurance. The trial court directed a verdict in the plaintiff's favor for $10,430. The court also denied Nationwide's motion for a directed verdict on the plaintiff's remaining claims and withdrew the fraudulent misrepresentation claim from the jury, but permitted the jury to consider plaintiff's negligent misrepresentation claim. The jury found in favor of the plaintiff in the amount of $5,670, and the Superior Court affirmed. *Rempel v. Nationwide Life Ins. Co.*, 227 Pa.Super. 87, 323 A.2d 193 (1974). This Court granted allocatur.

The plurality cited with approval to Section 552, but did not expressly adopt it. Nationwide's challenge on appeal focused on whether the plaintiff and her husband were justified in relying on the representations made by the Nationwide agent when they could have simply read the policy to discover the actual coverage the policy afforded. This Court determined that, under the facts of the case, the evidence was sufficient to

present a jury question of whether the plaintiff and her husband had justifiably relied on the agent's representations.

In summary, although this Court has cited with approval to Section 552 on multiple occasions, this Court has never explicitly adopted Section 552 as the law in Pennsylvania, much less the specific comment and illustration which are relied upon by Bilt–Rite here. In *Bortz*, the most recent case, we listed the elements of the common law tort of negligent misrepresentation, elements which appear to be more general in nature than those in Section 552, which perhaps would make the tort available against a narrower class of tortfeasors. Thus, on their face, the *Bortz* elements would appear to apply to any allegation of negligent misrepresentation against any individual no matter what his occupation or relationship to the injured party. In contrast, Section 552 is more specific, appearing to apply on its face only to actions against those individuals who, in the course of their business, profession or employment, or in any other transaction in which they have a pecuniary interest, supply false information for the guidance of others in their business transactions. It is arguable that Section 552, due to its specific nature, was not necessarily intended to apply in a case such as *Gibbs*, because an adoption might not be considered a business transaction and because Children and Youth likely did not have a pecuniary interest in the adoption at issue, while the more general *Bortz* common law elements would apply in such a case. Thus, it would appear that, if this Court were to adopt Section 552, it would not supplant the common law version of the Pennsylvania tort, but rather, would serve to clarify the elements of the tort as they apply to those in the business of supplying information to others for pecuniary gain.

General principles of tort law of necessity come into play in our examination of the common law tort of negligent misrepresentation and the tort embodied in Section 552, and those principles are particularly pertinent in this case. It is well established that, "[a] cause of action in negligence requires allegations that establish the breach of a legally recognized duty or obligation that is causally connected to the

damages suffered by the complainant." *Sharpe v. St. Luke's Hospital,* 573 Pa. 90, 821 A.2d 1215, 1218 (2003) (citation omitted). "The primary element in any negligence cause of action is that the defendant owes a duty of care to the plaintiff." *Althaus ex rel. Althaus v. Cohen,* 562 Pa. 547, 756 A.2d 1166, 1168 (2000). The *Althaus* Court further summarized the traditional considerations of public policy involved in any assessment of the existence of a duty of care as follows:

> "In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than 'the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection' from the harm suffered.... To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times. The late Dean Prosser expressed this view as follows:
>
>> These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the Constitution, is what we make it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question. When we find a duty, breach and damage, everything has been said. The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, 'always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.'
>
> [Prosser, *Palsgraf Revisited,* 52 Mich. L. Rev. 1, 14–15 (1953).]"

756 A.2d at 1168–69, *quoting Sinn v. Burd,* 486 Pa. 146, 404 A.2d 672, 681 (1979) (citation and footnote from *Sinn* omitted).

Accord *Sharpe,* 821 A.2d at 1219. The factors utilized in determining the existence of a duty are well-settled:

> The determination of whether a duty exists in a particular case involves the weighing of several discrete factors which include: (1) the relationship between the parties; (2) the social utility of the actor's conduct; (3) the nature of the risk imposed and foreseeability of the harm incurred; (4) the consequences of imposing a duty upon the actor; and (5) the overall public interest in the proposed solution.

*Althaus,* 756 A.2d at 1169 (listing cases).

The concept of duty in the tort setting can be intertwined with contractual notions of privity, as is the case here, where the task is to determine whether the relationship between the parties gives rise to a duty. In *Sharpe,* this Court considered whether the lack of a contractual relationship between the parties precluded a finding that a duty existed between the parties. There, Federal Express contracted with the defendant hospital to collect urine samples from Federal Express employees for routine, random drug testing and then forward the samples to an outside laboratory for testing. The plaintiff, a Federal Express employee/courier, reported to the hospital to provide the required urine sample, which the hospital later reported as testing positive for cocaine. The plaintiff alleged that there were problems with the chain of custody of her sample, as a result of which it was misidentified and/or mishandled. Once the hospital investigated and verified the chain of custody to Federal Express, the plaintiff's employment was terminated.

The plaintiff sued the hospital, claiming that it owed her a duty of care in regards to the collection and handling of her specimen, that it breached the duty of care, and that as a result, her test resulted in a false positive causing her to lose her job. The hospital filed a motion for summary judgment, arguing that it owed no duty to the plaintiff because the hospital's contractual relationship was with Federal Express, not the plaintiff. The lack of a professional or contractual relationship, according to the hospital, obviated the existence of any duty to the plaintiff. The trial court granted the

motion for summary judgment, finding that, where a third party engages an entity to perform employee drug testing, the employee cannot maintain a negligence action against the entity. The Superior Court affirmed, declining to recognize a duty on the part of the hospital where its role was limited to collecting the specimen. President Judge McEwen dissented, opining that because the plaintiff was already employed by Federal Express and was not merely seeking employment, there is a recognized duty on the part of the hospital, requiring it to abide by a standard of reasonable and prudent conduct to prevent any undue risk of harm caused by a false positive result.

On further appeal, this Court, after citing the *Althaus* factors for determining the existence of a duty, found that the hospital indeed owed a duty to the plaintiff:

> As to the first of the *Althaus* factors, a sufficient relationship exists between the Hospital and Sharpe to justify the imposition of a duty upon the Hospital to exercise reasonable care in the collection and handling of the urine specimen, despite the absence of a contract between the two parties. Specifically, Sharpe personally presented herself to the Hospital, which was aware of the purpose of the urine screening; the Hospital, in turn, should have realized that any negligence with respect to the handling of the specimen could harm Sharpe's employment.

*Sharpe*, 821 A.2d at 1219. Thus, this Court recognized that a tort duty can arise absent privity of contract in that circumstance.

With these established negligence principles in mind, we next turn to an examination of the persuasiveness of the cases relied upon by the courts below in support of the holding that Bilt–Rites negligent misrepresentation claim fails as a matter of law—*i.e.*, the Superior Courts decision in *Linde* and the federal district courts *Palco* decision. In *Linde,* the plaintiff, Linde Enterprises, was the low bidder who was awarded a contract for the reconstruction of a dam in Hazel Township owned by the Hazelton City Authority (HCA). HCA hired an engineering firm, WECO, to provide the specifications for the

dam and to supervise its construction. Linde incurred significant cost overruns, which it attributed to faulty specifications provided by the HCA and negligent supervision by WECO, and filed suit against both HCA and WECO. Following a jury trial, the jury found in favor of the plaintiff and against both defendants.

On appeal, the Superior Court reversed the jury verdict against WECO, finding that Linde could not recover in negligence against WECO because there was no privity of contract between them. The panel reasoned that a negligence claim cannot be based upon circumstances for which the law imposes no recognized duty of care on the defendant and that privity of contract is required between the parties in order to maintain a claim for professional liability. Since Linde had no contractual relationship with WECO and WECO owed no traditional duty of care to Linde, the panel held that WECO was not liable to Linde for its cost overruns, damages which were purely economic in nature. The panel further opined:

Linde also claims that WECO as an architect drawing up design specifications owes a duty under Pennsylvania law to the contractors who apply specifications. Several states have allowed a contractor to sue an architect for economic damages suffered by negligent drafting of design specifications despite the absence of privity. *See, e.g., Donnelly Constr. Co. v. Oberg/Hunt/Gilleland,* 139 Ariz. 184, 677 P.2d 1292 (1984); *Owen v. Dodd,* 431 F.Supp. 1239 (D.C.Miss. 1977) (applying Mississippi law); *Shoffner Indus. v. W.B. Lloyd Const. Co.,* 42 N.C.App. 259, 257 S.E.2d 50 (1979). However, Pennsylvania is not one of them. Moreover, there does not appear to be a clear-cut majority position on the issue in other jurisdictions. *See Annot. Tort Liability of Project Architect for Economic Damages Suffered by Contractor,* 65 A.L.R.3d 249–265. We will continue the *status quo,* as Linde has not offered a compelling reason why we should deviate from the well-established requirement of privity to adopt a rule holding negligent architects directly liable for economic damages to contractors with whom they share no contractual relationship.

*Linde,* 602 A.2d at 901 (footnote omitted). Thus, the *Linde* panel's rejection of the claim derived largely from a concern that existing Pennsylvania law had yet to embrace this sort of action.

In *Palco,* the U.S. District Court for the Middle District of Pennsylvania addressed the precise issue presented in this appeal in a case involving a construction project to rehabilitate a city-owned reservoir for the City of Harrisburg's Department of Public Works. Pavex, Inc., was the general contractor and Brinjac–Chester Engineers ("Brinjac") the registered architect/engineer on the job. Palco Linings subcontracted with Pavex to furnish and install a liner and cover at the reservoir. During the course of the project, complications allegedly caused Palco to incur substantial unexpected costs. When Pavex and the City refused to pay the increased expenses, Palco sued Brinjac for negligence and negligent misrepresentation. Brinjac filed a motion for summary judgment arguing, *inter alia,* that the economic loss rule barred the tort action. Palco countered that Pennsylvania applies the economic loss rule only in product liability cases and that Brinjac had mischaracterized its damages as purely economic losses. In granting Brinjac's motion for summary judgment, the district court applied the economic loss rule as a bar to recovery in an action which it deemed to be contractual in nature:

The rationale of the economic loss rule is that tort law is not intended to compensate parties for losses suffered as [a] result of a breach of duties assumed only by agreement. Compensation in such cases requires an analysis of damages which were in the contemplation of the parties at the origination of the agreement, an analysis within the sole purview of contract law. On the other hand, the policy consideration underlying tort law is the protection of persons and property from losses resulting from *injury, Sensenbrenner v. Rust, Orling Neale Architects, Inc.,* 236 Va. 419, 374 S.E.2d 55 (1988), while the policy consideration underlying contract law is the protection of expectations bargained for. *Id.* Thus in light of these distinctions, to

recover in tort a plaintiff must allege facts showing a breach of some duty imposed by law. In other words, to recover in negligence "there must be a showing of harm above and beyond disappointed expectations" evolving solely from a prior agreement. A buyer, contractor, or subcontractor's "desire to enjoy the benefit of his bargain is not an interest that tort law traditionally protects." *See Redarowicz v. Ohlendorf,* 92 Ill.2d 171, 177, 65 Ill.Dec. 411, 441 N.E.2d 324 (1982) *cited in Anderson Electric, Inc. v. Ledbetter Erection Corporation,* 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246 (1986).

*Palco,* 755 F.Supp. at 1271.

Based upon the case law from Illinois which it deemed persuasive, the *Palco* court rejected the application of Section 552, finding that liability under Section 552 is limited to those in the business of selling information upon which customers rely in taking additional action. *Id.,* citing *Hi–Grade Cleaners, Inc. v. American Permac, Inc.,* 561 F.Supp. 643 (N.D.Ill. 1982). The court concluded that Section 552 applies only to occupations such as "attorneys, abstractors of title, surveyors, inspectors of goods, operators of ticker services, and banks dealing with non-depositors' checks." *Id.,* citing *Moorman Manufacturing Co., v. National Tank Co.,* 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982), *Anderson Electric, Inc. v. Ledbetter Erection Corporation,* 115 Ill.2d 146, 104 Ill.Dec. 689, 503 N.E.2d 246 (1986). Concluding that Palco was not induced by Brinjac's specifications to take any action it was not already contractually bound to take due to its subcontract with Pavex, and because there was no separate business transaction between Palco and Brinjac, and thus no privity of contract, the court found that Palco could not maintain a tort action against Brinjac as a matter of Pennsylvania law.

As the highest court in Pennsylvania confronted with a first impression issue of Pennsylvania law, this Court is not bound by *Linde* or *Palco.* It is notable that courts in other jurisdictions have reached a result contrary to *Linde* and *Palco.* For example, *Nota Construction Corp. v. Keyes Associates,* 45 Mass.App.Ct. 15, 694 N.E.2d 401 (1998), involved a subcontractor who bid on a school construction project based upon

plans and specifications prepared by an architect retained by the school district. In the plans, the architect made certain representations regarding the area surrounding the septic system. Nota Construction sued the architect claiming that it had suffered economic losses directly caused by its reliance on the architect's plans and specifications. The architect filed a motion for summary judgment arguing, *inter alia,* that Nota's negligent misrepresentation claim was barred by the economic loss doctrine. The trial court granted summary judgment in favor of the architect.

On appeal, the architect argued that the action was barred by the economic loss doctrine and that a design professional could not be held liable for negligent misrepresentation because the design professional is not in the business of supplying specific information to others to induce action. Rejecting both arguments, the Appeals Court reversed. As to the economic loss doctrine, the court noted that economic losses resulting from negligent misrepresentation are an exception to the economic loss doctrine. *Id.* at 405 (*citing Craig v. Everett M. Brooks Co.,* 351 Mass. 497, 222 N.E.2d 752 (1967)). On the second issue, the court stated simply that it is logical that the general proposition that one who negligently furnishes services to another can be liable in tort should apply to design professionals, at least where they have reason to know that the putative plaintiff will be relying upon the architect's work product:

> [T]he Supreme Judicial Court [of Massachusetts] has held that liability will be imposed in Massachusetts for the negligent furnishing of services to one not a party to the contract where the defendant knows that the party will rely on his services.... Accordingly, we see no reason why a design professional such as an architect should be exempt from liability for negligent misrepresentation to one where there is no privity of contract. This view is in accord with a number of other jurisdictions.

*Id.* at 405–06 (footnote and citations omitted) (collecting cases).

In another school construction case, *Donnelly Construction Co. v. Oberg/Hunt/ Gilleland,* 139 Ariz. 184, 677 P.2d 1292

(1984), the Arizona Supreme Court held that Section 552 governed an action by a contractor against an architect where the contractor had relied upon the architect's plans and specifications in bidding on a school improvement project and then suffered economic losses as a result of errors in the plans and specifications. Notably, the court found Illustration 9 to Section 552 to be "particularly enlightening and [ ] pertinent to the case." *Id.* at 1297. The court also found no privity requirement, employing the following persuasive analysis:

> There is no requirement of privity in this state to maintain an action in tort.... Rather, an action in negligence may be maintained upon the plaintiff's showing that the defendant owed a duty to him, that the duty was breached, and that the breach proximately caused an injury which resulted in actual damages....
>
> Design professionals have a duty to use ordinary skill, care and diligence in rendering their professional services.... When they are called upon to provide plans and specifications for a particular job, they must use their skill and care to provide plans and specifications which are sufficient and adequate.... This duty extends to those with whom the design professional is in privity ... and to those with whom he or she is not....

*Id.* at 1295 (citations to Arizona precedent omitted).

Other jurisdictions have reached the same conclusions as the *Nota* and *Donnelly* courts in similar cases involving design architects or engineers. *See, e.g., Robert & Company Associates v. Rhodes–Haverty Partnership,* 250 Ga. 680, 300 S.E.2d 503 (1983) (where engineer knows that prospective purchasers of property could rely on his report as to condition of property, lack of privity does not shield engineer from liability to purchasers and solely economic damages are recoverable); *Jim's Excavating Service, Inc. v. HKM Associates,* 265 Mont. 494, 878 P.2d 248 (1994) (low bidder on pipeline construction project could recover purely economic losses against engineer who prepared plans and specifications for project absent privity; adopts Section 552 and cites Illustration 9 with approval); *Davidson and Jones, Inc. v. County of New Hanover,* 41

N.C.App. 661, 255 S.E.2d 580 (1979) (architect liable to general contractor who submitted low bid for county construction project based on report submitted by architect for negligent misrepresentation, absent privity and where loss was purely economic); *Tommy L. Griffin Plumbing & Heating Co. v. Jordan, Jones & Goulding, Inc.*, 320 S.C. 49, 463 S.E.2d 85 (1995) (economic loss doctrine does not bar contractor from recovering, absent privity, against engineer on theory of negligent misrepresentation in design of project); *John Martin Co., Inc. v. Morse/Diesel, Inc.*, 819 S.W.2d 428 (Tenn.1991) (Section 552 governs negligent misrepresentation claim by subcontractor that construction manager negligently supplied information intended for guidance of others so long as use of information was foreseeable; no privity required).

■ We are persuaded by these decisions from our sister jurisdictions that: (1) this Court should formally adopt Section 552 of the Restatement (Second), which we have cited with approval in the past, as applied by those jurisdictions in the architect/contractor scenario; (2) there is no requirement of privity in order to recover under Section 552; and (3) the economic loss rule does not bar recovery in such a case. Recognizing such a cause of action, with such contours, is consistent with Pennsylvania's traditional common law formulation of the tort of negligent misrepresentation.

■ Section 552 sets forth the parameters of a duty owed when one supplies information to others, for one's own pecuniary gain, where one intends or knows that the information will be used by others in the course of their own business activities. The tort is narrowly tailored, as it applies only to those businesses which provide services and/or information that they know will be relied upon by third parties in their business endeavors, and it includes a foreseeability requirement, thereby reasonably restricting the class of potential plaintiffs. The Section imposes a simple reasonable man standard upon the supplier of the information. As is demonstrated by the existing case law from Pennsylvania and other jurisdictions, and given the tenor of modern business practices with fewer

generalists and more experts operating in the business world, business persons have found themselves in a position of increasing reliance upon the guidance of those possessing special expertise. Oftentimes, the party ultimately relying upon the specialized expertise has no direct contractual relationship with the expert supplier of information, and therefore, no contractual recourse if the supplier negligently misrepresents the information to another in privity. And yet, the supplier of the information is well aware that this third party exists (even if the supplier is unaware of his specific identity) and well knows that the information it has provided was to be relied upon by that party. Section 552 is not radical or revolutionary; reflecting modern business realities, it merely recognizes that it is reasonable to hold such professionals to a traditional duty of care for foreseeable harm.

Like the court in *Nota,* we see no reason why Section 552 should not apply to architects and other design professionals. The rationale for this application was persuasively set forth by the Court of Appeals of North Carolina in *Davidson,* where the court stated that such a duty to foreseeable third parties flows from the architect's contractual duties to the party retaining the architect, an approach we embrace:

An architect, in the performance of his contract with his employer, is required to exercise the ability, skill, and care customarily used by architects upon such projects.... Where breach of such contract results in foreseeable injury, economic or otherwise, to persons so situated by their economic relations, and community of interests as to impose a duty of due care, we know of no reason why an architect cannot be held liable for such injury. Liability arises from the negligent breach of a common law duty of care flowing from the parties' working relationship. Accordingly, we hold that an architect in the absence of privity of contract may be sued by a general contractor or the subcontractors working on a construction project for economic loss foreseeably resulting from breach of an architect's common law

duty of due care in the performance of his contract with the owner.

*Davidson,* 255 S.E.2d at 584 (citation omitted).

We recognize that a design professional's liability for economic damages to third parties cannot be without limits but, we are satisfied, Section 552 is sufficiently narrowly tailored as to ensure appropriate limitation. In *John Martin Company,* the Supreme Court of Tennessee, having adopted Section 552, discussed those appropriate limitations:

The defendant is liable only to those, whether in contractual privity or not, for whose benefit and guidance the information is supplied. The information may be either direct or indirect. In that regard, the foreseeability of use is critical to liability.

Because the information is negligently rather than intentionally supplied, courts have been careful to limit liability to only those whose use of the information is reasonably foreseeable:

By limiting the liability for negligence of a supplier of information to be used in commercial transactions to cases in which he manifests an intent to supply the information for the sort of use in which the plaintiff's loss occurs, the law promotes the important social policy of encouraging the flow of commercial information upon which the operation of the economy rests.

Restatement (2d) of Torts § 552 Comments (1977).

*John Martin Company,* 819 S.W.2d at 431–32 (*quoting* comment a).

This Court is also satisfied that specific recognition of the Section 552 formulation of this tort is consistent with this Court's traditional approach to questions of tort duty. *See Sharpe, supra; Althaus, supra.* First, although an architect or design professional may not have a contractual relationship with the contractor who ultimately suffers economic damages in reliance upon the professional's design, in an instance such as the case *sub judice,* the professional is well aware that the design will be provided to and utilized by others in their own

business dealings. Second, on the question of the social utility of the conduct at issue, obviously design professional services play an important role in public and private planning. But, by the same token, given the important reliance placed upon such professional services, there is no reason to exempt such professionals from the tort consequences of a negligent failure to perform those services in a competent fashion. Third, given the limitations upon the Section 552 action which we have outlined above, this Court is satisfied that the tort more than adequately accounts for the nature of the risk the duty imposes and the foreseeability of the prospective harm. Fourth, the consequence of imposing such a duty upon design professionals is neither unreasonable nor unduly burdensome; it merely subjects them to the same sort of professional responsibility other professionals face. And finally, the Section 552 formulation of the tort will serve the overall public interest by discouraging negligence among design professionals, while not requiring any more of them than is required by the traditional reasonable man and foreseeability tort paradigm applicable to others.

Accordingly, we hereby adopt Section 552 as the law in Pennsylvania in cases where information is negligently supplied by one in the business of supplying information, such as an architect or design professional, and where it is foreseeable that the information will be used and relied upon by third persons, even if the third parties have no direct contractual relationship with the supplier of information. In so doing, we emphasize that we do not view Section 552 as supplanting the common law tort of negligent misrepresentation, but rather, as clarifying the contours of the tort as it applies to those in the business of providing information to others.

On the question of privity, as discussed earlier, this Court in *Sharpe* recognized that a similar type of tort duty can arise in the absence of privity. In any event, Section 552 imposes a duty of reasonable care upon the supplier of professional information for use by others. Both on its face and as a matter of logic, Section 552 negates any requirement of privity; therefore, we find that the absence of privity does not

defeat a Section 552 claim, and does not negate Bilt–Rite's claim in the case *sub judice.*

As to the economic loss rule, the South Carolina Supreme Court took a reasoned approach to the rule in *Tommy L. Griffin Plumbing, supra,* as it discussed the realities of tort law versus contract law:

> [Our earlier] application of the "economic loss" rule maintains the dividing line between tort and contract while recognizing the realities of modern tort law. Purely "economic loss" may be recoverable under a variety of tort theories. The question, thus, is not whether the damages are physical or economic. Rather, the question of whether the plaintiff may maintain an action in tort for purely economic loss turns on the determination of the source of the duty plaintiff claims the defendant owed. A breach of a duty which arises under the provisions of a contract between the parties must be redressed under contract, and a tort action will not lie. A breach of duty arising independently of any contract duties between the parties, however, may support a tort action.

*Tommy L. Griffin Plumbing,* 463 S.E.2d at 88 (footnote and citation omitted). The court noted that economic losses are routinely allowed in tort actions in other contexts such as legal malpractice, accountant malpractice, and architect liability.

Like South Carolina, Pennsylvania has long recognized that purely economic losses are recoverable in a variety of tort actions including the professional malpractice actions noted by the South Carolina Supreme Court. We agree with that court that a plaintiff is not barred from recovering economic losses simply because the action sounds in tort rather than contract law. Here, Bilt–Rite had no contractual relationship with TAS; thus, recovery under a contract is not available to Bilt–Rite. Having found that Bilt–Rite states a viable claim for negligent misrepresentation under Section 552, and that privity is not a prerequisite for maintaining such an action, logic dictates that Bilt–Rite not be barred from recovering the damages it incurred, if proven. Indeed, to apply the economic loss doctrine in the context of a Section 552 claim would be

nonsensical: it would allow a party to pursue an action only to hold that, once the elements of the cause of action are shown, the party is unable to recover for its losses. Thus, we hold that the economic loss rule does not apply to claims of negligent misrepresentation sounding under Section 552.

In light of the above, it is apparent that the decisions below cannot stand. Illustration 9 to Section 552 indeed sets forth a scenario that is closely analogous to the instant case and demonstrates how Section 552 should apply here. Accepting the allegations in Bilt–Rite's complaint as true for purposes of the demurrer, TAS provided plans and specifications for the school project to the school district with full knowledge that those plans and specifications would be included in a bid package supplied to prospective bidders, and relied upon by those bidders. Bilt–Rite received the plans from the school district and, according to its complaint, relied upon them in calculating its bid, suffering economic damage as a result of alleged misrepresentations in the plans. This case falls precisely within the framework of Section 552, and therefore, it is cognizable under Pennsylvania law.

Accordingly, the order of the Superior Court is reversed and the matter is remanded to the trial court for further proceedings.

Former Chief Justice ZAPPALA did not participate in the consideration or decision of this case.

Chief Justice CAPPY files a dissenting opinion.

Justice SAYLOR files a dissenting opinion.

CAPPY, Chief Justice, dissenting.

I respectfully dissent. While I agree with the majority that Section 552 of the Restatement (Second) of Torts is consistent with Pennsylvania law, I would hold that Section 552 does not apply in this case. Accordingly, I would affirm the order of the Superior Court.

If I were writing on a clean slate, I would take issue with the majority's formal adoption of Section 552. In my view, the

common law tort of negligent misrepresentation, in requiring a particularized determination in any given case as to whether one party owed another party a duty in tort, is the vehicle that should be used to impose liability for negligent misrepresentations. *See Bortz v. Noon,* 556 Pa. 489, 729 A.2d 555, 561 (1999). I recognize, however, that the negligent misrepresentation tort presently set forth in Section 552 is an established part of Pennsylvania jurisprudence. In *Renn v. Provident Trust Co.,* 328 Pa. 481, 196 A. 8 (1938), this court acknowledged the rule of tort liability that Section 552 encompasses, stating that "we have held that when it is one's business and function to supply information he is liable, if, knowing that action will be influenced, he supplies it negligently." *Id.* at 9–10 (citations omitted), *cited in* Pennsylvania Annotations to the Restatement (First) of Torts, Section 552 and in Reporter's Notes to the Restatement (Second) of Torts, Section 552 regarding Comment c, Illustration 1.

That said, I would not allow Bilt–Rite Contractors Inc. ("Bilt–Rite") to sue The Architectural Studio ("TAS") in tort under Section 552 for cost overruns arising out of its performance of its contractual obligations on a construction project. I would, instead, follow the economic loss doctrine, which provides that purely economic losses are not recoverable under a tort theory, and preclude Bilt–Rite's suit. *See Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.,* 652 F.2d 1165, 1169 n. 12 (3d Cir.1981). *See also* Sidney R. Barrett, Jr., *Recovery of Economic Loss in Tort for Construction Defects: A Critical Analysis,* 40 S.L.C. Rev. 895 (1989) ("Barrett Article"). I believe that the doctrine's demarcation line between the law of contracts, which is designed to enforce expectations created by agreement, and the law of torts, which is designed to protect persons and their property by imposing a duty of reasonable care upon others, should be respected in this context, where multiple parties bargain and enter into a network of contracts to allocate risks and to define their respective rights and obligations. *See* Barrett Article at 894–95, 941.[1]

1. In its complaint, Bilt–Rite alleges that in connection with the construction project, TAS and the owner of the constriction project entered

In this regard, I agree with the reasoning and conclusion of the Supreme Court of Washington in a case on all fours with the instant matter, *Berschauer/Phillips Construction Co. v. Seattle School District No. 1,* 124 Wash.2d 816, 881 P.2d 986 (1994). In *Berschauer/Phillips,* a general contractor, who expended more funds than expected and was delayed in the completion of a construction project, brought several claims against the project's architect in tort, alleging that the architectural plans were incomplete and inaccurate. As a general proposition, the court held that the economic loss doctrine precluded the contractor's tort claims, stating:

> [W]e maintain the fundamental boundaries of tort and contract law by limiting the recovery of economic loss due to construction delays to the remedies provided by contract. We so hold to ensure that the allocation of risk and the determination of potential future liability is based on what the parties bargained for in the contract. We hold parties to their contracts. If tort and contract remedies were allowed to overlap, certainty and predictability in allocating risk would decrease and impede future business activity. The construction industry in particular would suffer, for it is in this industry that we see most clearly the importance of the precise allocation of risk as secured by contract. The fees charged by architects, engineers, contractors, developers, vendors, and so on are founded on their expected liability exposure as bargained and provided for in the contract. We so hold to ensure that the allocation of risk and the determination of potential future liability is based on what the parties bargained for in the contract.

*Id.* at 992.

Even though Section 552 had been adopted in Washington, the court also rejected the contractor's request to permit its Section 552 claim against the architect to proceed. The court stated that "when parties have contracted to protect against

into a contract, and that the owner and Bilt–Rite entered into a contract, which specifically referred to and incorporated by reference certain "Contract Documents", including the plans and specifications that TAS prepared. Complaint ¶¶ 5, 11.

potential economic liability, as is the case in the construction industry, contract principles override the tort principles in [Section] 552 and, thus, purely economic damages are not recoverable." *Id.* at 993 (citations omitted).

Likewise, I believe that application of the economic loss doctrine is especially warranted in the construction setting, and that bargained-for contractual arrangements should govern the parties' legal relationships and their economic expectations. Therefore, I would not allow Bilt–Rite to sue TAS under Section 552 of the Restatement (Second) of Torts.

For these reasons, I respectfully dissent.

SAYLOR, Justice, dissenting.

I agree with Mr. Chief Justice Cappy that the present controversy is best resolved by invocation of the economic loss doctrine, but my reasoning proceeds from a somewhat different viewpoint in terms of the general application of such doctrine.

At the outset, in addressing the issues in this appeal, I believe that it is important to maintain the perspective that the Court is engaged in the evaluation of substantive principles under the common law, and that the nature of this exercise favors adherence to reasoned precedent. This approach reflects that the fashioning of substantive rules in matters involving weighty and competing interests (as to which inquiry must be made into the varying consequences that will attend implementation of the different options) is often best suited to the legislative province.[1] It is also signifi-

1. The substantial, competing policy considerations with which this Court is faced in fashioning Pennsylvania's common law answer to this question are amply developed by the majority on the one hand, and Chief Justice Cappy, on the other. Briefly, foreclosing the cause of action for negligent misrepresentation relative to design professionals will likely increase construction costs by requiring exhaustive design investigation by contractors as a prerequisite to bidding. *See* Philip L. Bruner and Patrick J. O'connor, Jr., 5 Bruner & O'connor Construction Law § 17:27 (2004). As the Chief Justice emphasizes, however, allowing the tort cause of action to be maintained impairs the ability of design professionals to regulate their own risk via contractual provision. *See* Dissenting Opinion at ——, 866 A.2d at 289 (quoting *Ber-*

cant that the General Assembly is aware of our precedents, and obviously, may choose to alter course in substantive affairs subject only to constitutional constraints.

My assessment therefore proceeds from this Court's long-standing practice of treating liability for negligent misrepresentations on the part of those in the business of providing information as a matter that is separate and apart from, and not subject to, the economic loss doctrine, *see, e.g., Renn v. Provident Trust Co.,* 328 Pa. 481, 482, 196 A. 8, 9–10 (Pa.1938), akin to the scheme set forth in Restatement (Second) Section 552. Accordingly, the central question of concern to me here is whether (and to what extent) persons and entities providing architectural services should be deemed to be in the business of supplying information for such purposes.

In *2314 Lincoln Park West Condominium Ass'n v. Mann, Gin, Ebel & Frazier, Ltd.,* 136 Ill.2d 302, 144 Ill.Dec. 227, 555 N.E.2d 346 (1990), the Illinois Supreme Court found design-related architectural services to be outside the general category of information services for purposes of the relevant exception to the economic loss doctrine. In so holding, the court borrowed from an Eleventh Circuit decision to contextualize the economic loss rule as follows:

"The rule acts as a shorthand means of determining whether a plaintiff is suing for injuries arising from the breach of a contractual duty to produce a product that conforms in terms of quality or performance to the parties['] expectations or whether the plaintiff seeks to recover for injuries resulting from the breach of the duty arising independently of the contract to produce a nonhazardous product that does not pose an unreasonable risk of injury to person or property. The economic loss rule prevents recovery in tort when a defective product has resulted in the loss of the value or use

schauer/*Phillips Constr. Co. v. Seattle School Dist. No.1,* 124 Wash.2d 816, 881 P.2d 986, 992 (1994)); *see also Blake Constr. Co. v. Alley,* 233 Va. 31, 353 S.E.2d 724, 727 (1987) ("Protection against economic losses caused by another's failure to properly perform is but one provision the contractor may require in striking his bargain."). Additionally, further uncertainty results from the difficulty in determining the proper scope of economic injuries subject to redress.

of the thing sold, or the cost of repairing it. Under such circumstances, the duty breached is generally a contractual one and the plaintiff is merely suing for the benefit of his bargain."

*2314 Lincoln,* 144 Ill.Dec. 227, 555 N.E.2d at 352 (quoting *Flintkote Co. v. Dravo Corp.,* 678 F.2d 942, 948 (11th Cir. 1982)); *accord* Sidney R. Barrett, Jr., The Center Holds: *The Continuing Role of the Economic Loss Rule in Construction Litigation,* 11–APR CONSTRUCTION LAW 3 (1991) (observing that, for purposes of the economic loss doctrine, "an 'economic loss' is the loss of an expectancy interest created by contract, often described as the 'benefit of the bargain' "). As concerns design-related architectural services, the Illinois court chose to characterize these as incidental to a tangible end product or object, namely, the construction of a building, as contrasted with information services producing opinions or ideas that do not result in some tangible end product (such as attorney and accountant services). *See 2314 Lincoln,* 144 Ill.Dec. 227, 555 N.E.2d at 352–53; *accord Tolan and Son, Inc. v. KLLM Architects, Inc.,* 308 Ill.App.3d 18, 241 Ill.Dec. 427, 719 N.E.2d 288, 295 (1999) (explaining that "an architect's duty generally arises by virtue of a contract specifying the duties necessary to complete the construction of a structure"). Thus, the court was able to categorize claims for negligent misrepresentation arising from design-related architectural services within the general prohibition against non-contractual recovery for economic loss, as opposed to the information-business exception.[2]

It should be frankly acknowledged that the Illinois approach has its limitations, both in terms of its dependence on charac-

2. As Appellee notes, the circumstances presented in Illustration 9 following Section 552 of the Restatement, relied on by the majority, *see* Majority Opinion at 463–64, 483–84, 866 A.2d at 276, 288, are distinguishable from design-related architectural services, since they do not reflect end-product design, but rather, concern a pre-bid, advisory, engineering report supplying information only. *See generally Tolan,* 719 N.E.2d at 298 (distinguishing design-related architectural services from circumstances in which an architect or engineer is engaged solely to provide information based upon an evaluation, and the value of the services lies in the analytical work rather than in the tangible end product).

terization to distinguish design-related architectural services from a broader range of services, and its practical implications in an era in which information-based products and services proliferate. *See generally Insurance Co. of N. Am. v. Cease Elec. Inc.,* 688 N.W.2d 462, 471–72 (Wis.2004) (criticizing the Illinois approach and adopting a bright-line rule that the economic loss doctrine is inapplicable to claims for the negligent provision of services). Having surveyed the many ways in which courts have addressed the competing interests involved, and recognizing that the Illinois position thus suffers from some of the drawbacks associated with common law pronouncements of substantive law, I nonetheless view it as a restrained one that best reconciles with the nature, purposes, and development of the economic loss and negligent misrepresentation doctrines in Pennsylvania, in the absence of legislative intervention.

Therefore, I concur in the Chief Justice's dissenting position that the Superior Court's order should be affirmed.