IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Megan Diaz on Behalf of the   :
Estate of Raymond Diaz, (Deceased), :
            Petitioner   :
                           :
           v.            :    No. 354 C.D. 2021
                           :    Argued: June 23, 2022
Department of General Services,   :
            Respondent   :

BEFORE:   HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE CHRISTINE FIZZANO CANNON, Judge
               HONORABLE MARY HANNAH LEAVITT, Senior Judge

OPINION
BY SENIOR JUDGE LEAVITT        FILED:  August 16, 2022

Megan Diaz (Claimant) petitions for review of the adjudication of the Pennsylvania Department of General Services (Department) that denied her claim for a $100,000 death benefit under the Emergency and Law Enforcement Personnel Death Benefits Act (Act 101).[1]  Claimant is the surviving spouse of Raymond Diaz (Decedent), who served the City of Philadelphia as a police officer.  In her appeal, Claimant argues the Department erred in concluding that Decedent did not die in the performance of his duties.  But for Decedent's work injury, his death by a combination of prescribed medications would not have occurred two years later.  Further, the City of Philadelphia's Department of Police and the City's Board of Pensions and Retirement both concluded the Decedent's death was the result of his service injury.  For the reasons that follow, we reverse the Department.

---

[1] Act of June 24, 1976, P.L. 424, No. 101, *as amended*, 53 P.S. §§891-892.1.

**Background**

In 1996, Decedent began working as a police officer for the City of Philadelphia. On November 14, 2014, he was injured in a motor vehicle accident in the course of his employment, sustaining a concussion and injuries to his neck and back. Decedent did not return to work after the vehicle accident, and prior to his death was collecting Heart and Lung Act[2] benefits.

On July 19, 2016, Decedent fell in his home and injured his left arm. A magnetic resonance imaging (MRI) test revealed a tear of the distal biceps tendon, which required surgery.

On September 6, 2016, Decedent underwent surgery to repair the tendon and was discharged on September 7, 2016, with a prescription for hydromorphone to treat his post-surgical pain. The following day, September 8, 2016, Decedent appeared fine. However, on September 9, 2016, Decedent was found unresponsive and died at the hospital. The City's medical examiner reported that the cause of death was Decedent's "[i]ntoxication by the [c]ombined [e]ffects of [h]ydromorphone, [o]xycodone and [f]entanyl [t]herapy for [c]hronic and [p]ost-[s]urgical [p]ain." Reproduced Record at 70a (R.R. __). Other contributors included "[o]bstructive [s]leep [a]pnea, [and] [h]ypertensive [h]eart [d]isease." *Id*.

On November 29, 2017, the City of Philadelphia, on behalf of Claimant, submitted an application to the Department for Act 101 death benefits. On April 10, 2019, Eric Decker, Assistant Bureau Director of the Department's Bureau of Finance and Risk Management, denied the application. He explained the decision as follows:

> Although the information provided via the medical examiner indicates that [Decedent] died as a result of "intoxication by the combined effects of hydromorphone, oxycodone, and fentanyl; therapy for chronic and post-surgical pain," the circumstances

---

[2] Act of June 28, 1935, P.L. 477, *as amended*, 53 P.S. §§637-638.

2

surrounding [Decedent's] death are too far removed from the service-related injury he sustained on November 14, 2014. Therefore, the claim for benefits is not eligible for payment under Act 101.

R.R. 88a. Claimant appealed the denial of death benefits and requested a hearing.[3]

The Department appointed a hearing officer to conduct the hearing on Claimant's appeal.[4] At the August 20, 2019, administrative hearing, both parties presented testimonial and documentary evidence,[5] as well as a joint stipulation of facts.

Claimant testified that she married Decedent on August 20, 2005, and they remained married until his death in 2016. Decedent had worked for 20 years as a police officer for the City of Philadelphia. On November 14, 2014, Decedent was involved in a work-related motor vehicle accident, sustaining injuries to his neck and back as well as a concussion, for which he was prescribed pain medication,

---

[3] The Department's regulation states, in pertinent part, as follows:

> There is hereby constituted in the Department a procedure for Departmental hearing of appeals from decisions by the Bureau [of Risk and Insurance Management] as to claims for death benefits made pursuant to the act, timely filed within 30 days of notice of the decision of the Bureau, as provided in §89.9 (relating to appeals). Notices of decisions by the Bureau in cases involving claimants whose decedent was an employe of a [political] subdivision will be sent to both the claimant and the subdivision. In cases where the decedent of the claimant was a [political] subdivision employe, appeals shall be filed by each unless the subdivision has previously paid the claim, in which event only the subdivision shall appeal.

4 Pa. Code §89.21.

[4] Initially, the Department appointed Jackie Wiest Lutz, Esquire. Thereafter, the assignment was transferred to Marc Moyer, Esquire, and, finally to Jason C. Giurintano, Esquire.

[5] Claimant's documentary evidence included: a marriage certificate, her personal notes, original injury paperwork, City of Philadelphia Encounter forms, fall injury paperwork, report of separation, toxicology report, medical examiner's report, death certificate, an agreement for the payment of workers' compensation death benefits, the medical report of the City's Medical Director, minutes from the Board of Pensions and Retirement, and the Report of Death prepared by the City Police Department. Notes of Testimony, 8/20/2019, at 52-54 (N.T. __); R.R. 146a-48a.

3

including a fentanyl patch. Claimant explained that after the accident Decedent had difficulty standing straight, could not focus his eyes, exhibited poor memory, and developed balance issues. In spite of using a cane when walking, Decedent's poor balance caused him to fall "quite often." N.T. 24; R.R. 118a.

Claimant testified that on July 19, 2016, Decedent got up to use the bathroom. Although walking with his cane, Decedent lost his balance and fell, injuring his head and shoulders. The following day, Claimant took Decedent to see the "work doctor," who ordered x-rays. N.T. 27; R.R. 121a. Thereafter, Decedent was referred to an orthopedic surgeon who diagnosed him with a torn left bicep, for which surgery was scheduled for September 6, 2016.

In advance of the surgery, as directed, Decedent stopped taking his prescribed pain medications and removed the fentanyl patch. Surgery was done on September 6, 2016, and Decedent was discharged the following day, with a prescription for hydromorphone to treat his post-surgical pain. Claimant testified that she gave Decedent one hydromorphone pill between 5:00 p.m. and 6:00 p.m. on the day of discharge, and he fell asleep. Claimant testified that the next morning, September 8, 2016, Decedent woke up and was fine. That day, he took only the hydromorphone.

Claimant testified that on September 9, 2016, Decedent could not be awakened. She called for emergency services, which transported Decedent to the hospital. Life-saving measures were attempted for about an hour, but Decedent could not be resuscitated and was pronounced dead.

On cross-examination, Claimant agreed that other "significant conditions contribut[ed] to [her husband's] death," including sleep apnea, which was identified in the medical examiner's report and on the death certificate. N.T. 66; R.R. 160a. Claimant further testified that on the day he died, Decedent was not

4

wearing his CPAP mask for sleep apnea and that he suffered from high blood pressure. N.T. 67; R.R. 161a.

Terryl Reid, a detective for the City of Philadelphia and the disability coordinator for Fraternal Order of Police Lodge #5, testified on behalf of Claimant. Reid explained that Marilyn V. Howarth, M.D., the City's Medical Director, reviews all medical records when an active City employee dies, and her opinion on cause of death is binding on the City's Board of Pensions and Retirement. With respect to Decedent, Reid testified that Dr. Howarth's report discussed the November 14, 2014, motor vehicle accident and an MRI performed on August 15, 2016, but her report did not mention the July 19, 2016, fall. Dr. Howarth concluded that Decedent's death was service related because the presence of oxycodone and fentanyl in his bloodstream was the result of his work injury.

For its part, the Department presented testimony from Eric Decker, the Assistant Bureau Director who denied the claim for Act 101 benefits. Decker reviews all claims for benefits submitted under Act 101. He testified about his review of Decedent's application and explained his determination to deny benefits to Claimant. Because death was by drug intoxication, not by concussive syndrome or neck and back injuries, Decker concluded that Decedent's death was not service related.

The Hearing Officer concluded that Decedent died of drug intoxication, not his work injuries, and, thus, did not die in the performance of his duties. His proposed adjudication offered the following conclusions:

> 9.    [Decedent] did not die as a result of the cervical sprain/strain he sustained in the performance of his duties [in the] November 14, 2014, [motor vehicle accident.]

10. [Decedent] did not die as a result of the lumbar sprain/strain he sustained in the performance of his duties [in the] November 14, 2014, [motor vehicle accident.]

11. [Decedent] did not die as a result of the post[-]concussive syndrome he sustained in the performance of his duties [in the] November 14, 2014, [motor vehicle accident].

12. The cause of [Decedent's] death was intoxication from the combined effects of [h]ydromorphone, [o]xycodone and [f]entanyl.

13. [Decedent's] September 6, 2016, surgery and the combined effects of [h]ydromorphone, [o]xycodone and [f]entanyl were the superseding cause of [Decedent's] death which was not reasonably foreseeable following the November 14, 2014[, motor vehicle accident].

Proposed Adjudication at 9-10, Conclusions of Law ¶¶9-13.

The Hearing Officer found no causal connection between the November 14, 2014, motor vehicle accident and Decedent's death in 2016 from intoxication caused by the combined effect of hydromorphone, oxycodone and fentanyl. Decedent was prescribed narcotic medications to alleviate the pain caused by his work injuries, and he was able to handle these narcotics. The introduction of the hydromorphone to his ongoing, pre-surgery drug mélange was the superseding cause of Decedent's death, not his injuries of November 14, 2014.

The Hearing Officer rejected the documentary evidence Claimant offered. This included the City Police Department's Separation and Accident, Injury and Illness Report of July 19, 2016, and the minutes of the City's Board of Pensions and Retirement approving a service-connected death benefit for Decedent. Both reports concluded that Decedent's death was service connected and were admitted without objection. However, the Hearing Examiner observed that the reports constituted unobjected to hearsay evidence and, while admissible, there was no evidence presented to corroborate the conclusions stated therein. Moreover, the

6

Hearing Officer did not credit Dr. Howarth's opinion, on which the Board of Pensions and Retirement relied. The Hearing Officer explained that Dr. Howarth presumed, without a factual foundation, that Claimant's death resulted from dependence on his narcotic medications. Decedent had survived almost 22 months using the narcotics prescribed to treat the pain caused by his work injury, and Decedent was not instructed to refrain from taking these medications while on hydromorphone.

Following the filing of exceptions to the proposed adjudication, the Department head, the Secretary of General Services, adopted the Hearing Officer's proposed adjudication and order in its entirety, thereby denying Claimant's application for Act 101 death benefits.

## Appeal

On appeal,[6] Claimant raises three issues. First, she argues that the Department erred because the evidence established that Decedent's death resulted from the performance of his duties. But for his work injury, he would not have died two years later of a toxic combination of prescribed medications. Second, she argues that the City reports concluding that Decedent's death was service connected were admitted into evidence, reliable, and not barred by the hearsay rule. Third, she argues that the Department violated her right to due process by adopting verbatim the Hearing Officer's proposed adjudication and by the change in Hearing Officer assigned to the administrative proceeding, after it began.

---

[6] This Court's review determines whether the factual findings in the adjudication are supported by substantial evidence, whether constitutional rights were violated, or whether an error of law was committed. *Ross Township v. Department of General Services*, 542 A.2d 613, 615 n.5 (Pa. Cmwlth. 1988).

**Analysis**

In her first issue, Claimant contends that the Department erred in holding that the connection between Decedent's work injury and his death was too attenuated to support a claim for Act 101 benefits. Decedent's 2014 motor vehicle accident caused him to develop balance problems, which led to his fall and the injury to his left arm in July 2016. But for that injury and the necessary surgical repair, Decedent would not have been prescribed hydromorphone, which, in combination with his work-related prescribed medications, caused Decedent's death.

The Department responds that there must be a direct causal connection between Decedent's work injury and death. Otherwise, a claimant is not entitled to benefits that compensate officers who die "in the performance of [their] duties." Section 1 of Act 101, 53 P.S. §891. Here, Decedent's death was caused by hydromorphone, which was prescribed to treat post-surgical pain, not to treat his work-related injuries.

Act 101 provides a death benefit to survivors of certain public servants engaged in hazardous occupations. *See* Section 1(a) of Act 101, 53 P.S. §891(a).[7]

_____

[7] Section 1(a) states:

> (a) In the event a law enforcement officer, ambulance service or rescue squad member, firefighter, certified hazardous material response team member, member of the Pennsylvania Civil Air Patrol or National Guard member *dies as a result of the performance of his duties*, an application, including a certification of death, shall be made to the department within four years of the date of such death by any of the following:
>> (1) A political subdivision.
>> (2) A Commonwealth agency.
>> (3) In the case of National Guard members, the Adjutant General.
>> (4) In the case of a member of a Commonwealth law enforcement agency, the agency head.
>> (5) In the case of a campus police officer, the university or college president.

8

The Act provides two forms of benefits: (1) a one-time cash payment of $100,000, adjusted for inflation, to a spouse or survivors, and (2) lifetime monthly payments to the spouse or survivors in an amount equal to the monthly salary of the deceased. Section 1(d) of Act 101, 53 P.S. §891(d).[8]  Benefits under the statute are administered by the Department.  Where it determines the death resulted from the performance of duties, the Department must approve a claim for benefits.  *See* 4 Pa. Code §89.5.[9]  Where it determines otherwise, the Department's determination may be appealed "and is subject to a due process hearing before a hearing examiner." *Murphy v. Township of Abington*, 490 A.2d 483, 498 (Pa. Cmwlth. 1985); *see also*

---

(6) Any survivor eligible for payment of benefits under this act or individual authorized to act on the survivor's behalf.

(7) In the case of the Pennsylvania Civil Air Patrol, the State Commander.

53 P.S. §891(a) (emphasis added).

[8] It states:

(d) Upon receipt of such certification, the Commonwealth shall, from moneys payable out of the General Fund, pay to the surviving spouse . . . of the paid firefighter, ambulance service or rescue squad member or law enforcement officer who died as a result of the performance of his duty the sum of $100,000, adjusted in accordance with subsection (f) of this section and an amount equal to the monthly salary, adjusted in accordance with subsection (f), of the deceased paid firefighter, ambulance service or rescue squad member or law enforcement officer, less any workers' compensation or pension or retirement benefits paid to such survivors, and shall continue such monthly payments until there is no eligible beneficiary to receive them[.]

53 P.S. §891(d).

[9] It states:

Upon approval of a claim for death benefits, the Commonwealth will pay the benefit, as follows:

(1) To the eligible beneficiary of a public safety officer employed by the Commonwealth.

(2) To the political subdivision for the purpose of distribution by the entity to the eligible beneficiary on whose behalf the certifying official filed the report of death for any public safety officer not employed by the Commonwealth.

4 Pa. Code §89.5.

9

4 Pa. Code §§89.21-89.35. Section 1(a)(6) of Act 101 is dispositive of eligibility and states, in relevant part, as follows:

> (a) In the event a law enforcement officer, ambulance service or rescue squad member, firefighter, certified hazardous material response team member, member of the Pennsylvania Civil Air Patrol or National Guard member dies *as a result of the performance of his duties*, an application, including a certification of death, shall be made to the department within three years of the date of such death by any of the following:
>
> * * *
>
> (6) Any survivor eligible for payment of benefits under this act or individual authorized to act on the survivor's behalf.

53 P.S. §891(a)(6) (emphasis added).

In *Crouse v. Department of General Services*, 601 A.2d 789 (Pa. 1992), the Pennsylvania Supreme Court addressed eligibility for Act 101 benefits. In that case, the decedent was a volunteer firefighter diagnosed with coronary artery disease and had suffered three myocardial infarctions. As a result, the decedent was placed on curtailed status by the fire department. Accordingly, on a day that the decedent's fire unit responded to a fire call, he remained at the fire station. When his co-workers returned to the station, they discovered that the decedent had died. The decedent's surviving spouse sought the lump sum death benefit provided for under Act 101, which at the time was $25,000.

In its first iteration, Act 101 limited the death benefit to survivors "of a fireman or law enforcement officer . . . killed in the performance of his duties." *Former* Section 1 of the Act of June 24, 1976, P.L. 424, No. 101.[10]  However, Act 101 was amended in 1981 as follows:

---

[10] It stated, in relevant part, as follows:

This act shall take effect immediately and its provisions shall be retroactive to January 1, 1976 and shall be applicable to the deaths of all firefighters, ambulance service or rescue squad members and law enforcement personnel *dying on and after said date as the direct result of injuries sustained in the performance of their duties,* regardless of the date when such injuries occurred.

Section 1 of the Act of October 16, 1981, P.L. 295, No. 102 (emphasis added). Under the amendment, the date of death could occur at any time without regard to the date of injury.

The Supreme Court agreed with this Court that the 1981 amendment to Act 101 expanded eligibility beyond a traumatic killing of an officer. The expansion covered fatal injuries resulting from stress, strain and disease, potentially long after the occurrence of the work injury. However, the phrase "sustained in the performance of . . . duties" had to be "interpreted to mean that something from the decedent's environment while on duty must precipitate the injury which causes death." *Crouse*, 601 A.2d at 795. Where the decedent suffers an unanticipated injury, the "claimant must show that the stimulus of [the] decedent's injury was initiated by the decedent's on-duty activities." *Id.* "However, if the injury suffered was related to a preexisting condition, the claimant must prove that the performance of duties exacerbated the condition to the extent that death was not a mere coincidence." *Id.*

In *Crouse*, the Supreme Court concluded that the surviving spouse of the decedent volunteer firefighter did not establish that the performance of his duties caused his death. It rejected the argument of the surviving spouse that because the

---

Section 1. A political subdivision shall pay to the surviving spouse, or if there is no surviving spouse, the minor children, of a fireman or law enforcement officer of the political subdivision killed in the performance of his duties the sum of $25,000.

*Former* Section 1 of the Act of June 24, 1976, P.L. 424, No. 101.

11

decedent died at work, this fact alone established eligibility. The Supreme Court observed that had the legislature intended to create a life insurance policy for any death that occurs at the work site, it would have so stated.

In sum, Act 101 requires a "causal relation between death and performance of duties," and it is to be construed liberally in favor of its intended beneficiaries. *Crouse*, 601 A.2d at 796. However, Act 101 is not intended to function as a general life insurance policy. *Id.*

Here, Decedent was involved in a motor vehicle accident while in the performance of his official duties, sustaining a concussion and injuries to his head and neck. Decedent was prescribed medication for his work injury pain, including oxycodone and fentanyl. Claimant's evidence established that the work injury also left Decedent with ongoing gait and balance problems, necessitating his use of a cane for walking. On July 19, 2016, Decedent lost his balance and fell, injuring his left arm, which fall the City accepted as work related. R.R. 60a.[11] The surgery to treat Decedent's left arm was followed by a prescription for hydromorphone. Two days later he died. The death certificate determined the cause of death to be intoxication by the combined effects of hydromorphone, oxycodone, and fentanyl. Affidavit, ¶¶8-10; R.R. 92a. The City Police Department determined that Decedent's death was service related.

Claimant's testimony and documentary evidence established a causal connection between Decedent's work injury and his death. But for the work injury, Decedent would not have been prescribed pain medication or experienced ongoing

---

[11] Decedent's immediate supervisor completed an Accident, Injury & Illness (COPA II) Report with respect to the fall which is completed for work-related injuries. The Report noted that Decedent was in "non-working I.O.D. [(Injury On Duty)] status" when the fall occurred. R.R. 60a. Decedent was treated by a "work doctor" for the injuries he sustained following his fall. N.T. 27; R.R. 121a. *See also* R.R. 53a-55a.

balance problems that led to his fall in 2016. But for that fall, he would not have needed surgery or been prescribed hydromorphone. Regardless of whether the fall resulted from his post-concussive syndrome, it is undisputed that but for Decedent's work injury, oxycodone and fentanyl would not have been present in his bloodstream when he took the hydromorphone, and their fatal combination with hydromorphone would not have occurred. Thus, Decedent's death was a direct result of the injuries he sustained in the performance of his official duties on November 14, 2014.[12]

The Department argues that because Decedent did not die from the cervical or lumbar injury or from post-concussive syndrome, the link between the service-related injury and the ultimate cause of death was broken. The Department's adjudication held that Decedent's death by intoxication was not the reasonably foreseeable result of his automobile accident and, further, the superseding cause of his death was the "combined effects of [h]ydromorphone, [o]xycodone and [f]entanyl." Proposed Adjudication, Conclusion of Law ¶13. The Department's analysis employed precepts from the common law of torts on the social duty of care owed to others.

Foreseeability is key to the principle of proximate cause, as established in *Palsgraf v. Long Island Railroad Company*, 162 N.E. 99 (N.Y. 1928). There, Mrs. Palsgraf was standing on a platform at the defendant's railroad waiting for a train. Some distance away, porters tried to help a passenger board a train. In doing

---

[12] Claimant notes that she was awarded death benefits under the Workers' Compensation Act, Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §§1-1041.4, 2501-2710. *See also* 34 Pa. Code §121.11. The Workers' Compensation Act's eligibility requirements are different than Act 101. *Dunn v. Department of General Services*, 542 A.2d 609, 611 (Pa. Cmwlth. 1988) (the legislature did not intend the Workers' Compensation Act to impact Act 101). *See also Ross*, 542 A.2d at 615-16. Therefore, the receipt of death benefits under the Workers' Compensation Act is not dispositive of whether a claimant is entitled to benefits under Act 101. Likewise, the receipt of benefits from the City Board of Pensions and Retirement is not dispositive of eligibility for Act 101 benefits.

so, they dislodged a package of fireworks he was carrying. The package fell to the rails and exploded, knocking over scales on the railroad platform and injuring Mrs. Palsgraf. The New York Court of Appeals, by Chief Justice Benjamin Cardozo, reversed the judgment against the railroad, *inter alia*, because the injury to Mrs. Palsgraf was not foreseeable and, thus, the railroad did not breach its duty of care to her. *See also Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 286-87 (Pa. 2005) (for the defendant's conduct to be actionable in negligence, the harm to the plaintiff must be foreseeable).

Likewise, superseding cause is a common law precept. In *Powell v. Drumheller*, 653 A.2d 619, 623 (Pa. 1995), our Supreme Court held a superseding, or intervening, cause of injury will relieve a tortfeasor of liability. *See also* RESTATEMENT (SECOND) OF TORTS §440 (Am. Law Inst. 1965) (defining a superseding cause).

Foreseeability and superseding cause are irrelevant to Act 101 benefits. The legislature could have incorporated these common law precepts into the language of the statute, but it did not do so. Under Act 101, the only relevant inquiry is whether death comes "as a result of the performance of [the decedent officer's] duties." 53 P.S. §891(a). But for Decedent's work injury, the fatal combination of drugs prescribed for his work injury with the hydromorphone would not have occurred.

Noting that Decedent used oxycodone and fentanyl patches to treat his work injury for 22 months without incident, the Department suggests that Decedent's death was caused by hydromorphone. The medical examiner's report and death certificate both established that it was the combination of medications that caused his death, not hydromorphone alone. In short, there is no evidence to

14

substantiate the Department's suggestion that the ongoing use of oxycodone and fentanyl were not related to Decedent's death.

We hold that Claimant established a causal connection between Decedent's injury sustained in the performance of his duties and his death. Therefore, the Department erred in denying her claim for death benefits under Act 101.[13]

### Conclusion

For the above-stated reasons, we reverse the Department's adjudication and hold that Claimant is entitled to benefits under Act 101.

_____
MARY HANNAH LEAVITT, President Judge Emerita

---

[13] Because of our decision, we need not address the other two issues raised by Claimant.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Megan Diaz on Behalf of the    :
Estate of Raymond Diaz, (Deceased), :
          Petitioner        :
                             :
       v.              :     No. 354 C.D. 2021
                             :
Department of General Services,   :
          Respondent       :

## ORDER

AND NOW, this 16th day of August, 2022, the adjudication of the Department of General Services, dated March 8, 2021, is reversed.

_____
MARY HANNAH LEAVITT, President Judge Emerita