2024 PA Super 195

| | | |
|---|---|---|
| RICE DRILLING B, LLC AND EQT PRODUCTION COMPANY | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellants | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 854 WDA 2023 |
| DOUGLAS A. SCOTT AND LINDA MARIE SCOTT | : | |
| | : | |

Appeal from the Order Entered July 13, 2023
In the Court of Common Pleas of Allegheny County Civil Division at
No(s): GD-22-014905

BEFORE: OLSON, J., SULLIVAN, J., and BENDER, P.J.E.

OPINION BY OLSON, J.: **FILED: September 4, 2024**

Appellants, Rice Drilling B, LLC ("Rice") and EQT Production Company ("EQT") (collectively, "Appellants") appeal from the July 13, 2023 order entered in the Court of Common Pleas of Allegheny County that, *inter alia*, transferred the case to the Court of Common Pleas of Greene County after sustaining preliminary objections filed by Douglas A. Scott and Linda Marie Scott (collectively, "the Scotts") that asserted, *inter alia*, improper venue. After careful review, we vacate the July 13, 2023 order and remand for further proceedings before the Court of Common Pleas of Allegheny County.

The trial court summarized the factual and procedural history as follows:

In December 2022, [Appellants] filed suit against [the Scotts] alleging breach of contract, negligent misrepresentation, tortious interference with contractual relations, abuse of process, and wrongful use of civil proceedings (also known as a "Dragonetti

Act[1] claim")[,] as well as requesting injunctive relief. [Appellants] filed an amended complaint in February 2023[, asserting the same causes of action.]

[Appellants brought this action against the Scotts] to enforce their rights under a Settlement Agreement[,] which they entered [into] with the Scotts on May 23, 2019 ("Settlement Agreement"). Under the Settlement Agreement, [the Scotts] consented to permit [Appellants] to enter [the Scotts'] property in Greene County[, Pennsylvania,] and construct a well pad on which to drill oil and gas wells. On May 23, 2019, the date the Scotts executed the Settlement Agreement, an EQT representative personally delivered a check to the Scotts in Greene County. The check was issued in Allegheny County[, Pennsylvania]. The day the Settlement Agreement was executed by the Scotts, [Appellants] also began accessing the Scotts' Greene County property. As proper venue is at issue in the present instance, it should be noted that Rice shares its principal place of business with EQT, which is located in Pittsburgh, Pennsylvania (Allegheny County), and the Scotts reside in Uniontown, Pennsylvania (Fayette County).

[By way of background, in] 2021, the Scotts filed [a separate action] against [Appellants] in Greene County, alleging [Appellants] failed to properly calculate royalties due [the Scotts] pursuant to the Settlement Agreement ("the 2021 complaint"). The Scotts failed to effect service on the 2021 complaint. They amended the 2021 complaint twice, both times in 2022. The Scotts' action was then administratively closed, and the time to appeal the administrative closure has passed. The Scotts' 2021 Greene County action is the underlying basis for [Appellants'

---

[1] 42 Pa.C.S.A. §§ 8351-8354. Under the Dragonetti Act,

[a] person who takes part in the procurement, initiation[,] or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings[ if] (1) he[, or she,] acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties[,] or adjudication of the claim in which the proceedings are based; and (2) the proceedings have terminated in favor of the person against whom they are brought.

42 Pa.C.S.A. § 8351(a) (formatting modified).

abuse of process and wrongful use of civil proceedings claims] in this Allegheny County suit.

In 2022, [Appellants] submitted applications to the Pennsylvania Department of Environmental Protection ("DEP") for permits to drill on [the Scotts'] Greene County property. These [oil and gas] wells were identified and consented to by [the Scotts. The Scotts] nevertheless objected to these well permit applications and requested [that] the DEP deny the applications. After modifications to the applications, the DEP issued the requested permits to [Appellants. The Scotts] appealed the DEP's permit issuance to the Pennsylvania Environmental Hearing Board ("EHB"). [Appellants] then filed [the aforementioned amended complaint] against the Scotts [in Allegheny County].

Trial Court Opinion, 11/14/23, at 1-3 (extraneous capitalization and section headings omitted).

Ultimately, on April 10, 2023, the Scotts filed amended preliminary objections to Appellants' amended complaint that, *inter alia*, challenged venue in Allegheny County as improper. On April 28, 2023, Appellants filed amended preliminary objections to the Scotts' amended preliminary objections, asserting, *inter alia*, that the Scotts' preliminary objection challenging venue failed to conform to the law or rules of court. The trial court subsequently entertained argument on the parties' respective positions and, thereafter, on July 13, 2023, sustained the Scotts' preliminary objection asserting that venue in Allegheny County was improper. The trial court transferred the matter to the Court of Common Pleas of Greene County. This appeal followed.[2]

---

[2] Both Appellants and the trial court complied with Pennsylvania Rule of Appellate Procedure 1925.

Appellants raise the following issue for our review:

Whether the trial court erred in sustaining the Scotts' preliminary objections pursuant to [Pennsylvania Rule of Civil Procedure] 1028(a)(1) asserting improper venue under [Pennsylvania Rule of Civil Procedure] 1006(a) and transferring the case to Greene County, when [Appellants'] chosen venue - Allegheny County - is a proper venue in which suit may be brought under Pennsylvania law?

Appellants' Brief at 6.

Appellants challenge the trial court's order sustaining the Scotts' amended preliminary objection, which raised a claim of improper venue in Allegheny County, and transferring the case to Greene County. *Id.* at 21-50.

Generally, this Court reviews a trial court order sustaining preliminary objections based upon improper venue for an abuse of discretion or legal error. Further, the construction of a statute raises a question of law. On questions of law, our standard of review is *de novo*, and our scope of review is plenary.

*Lugo v. Farmers Pride, Inc.*, 967 A.2d 963, 970 (Pa. Super. 2009) (citations omitted), *appeal denied*, 980 A.2d 609 (Pa. 2009).

A plaintiff's choice of forum is to be given great weight, and the burden is on the party challenging the choice to show it was improper. However, a plaintiff's choice of venue is not absolute or unassailable. Indeed, if there exists any proper basis for the trial court's decision to [sustain the preliminary objections and] to transfer venue, the decision must stand.

*Anthony v. Parx Casino*, 190 A.3d 605, 607 (Pa. Super. 2018) (citation and original brackets omitted). "[T]he presumption in favor of a plaintiff's choice of forum has no application to the question of whether venue is proper in the plaintiff's chosen forum[. V]enue either is or is not proper." *Scarlett v.*

*Mason*, 89 A.3d 1290, 1293 (Pa. Super. 2014) (citation omitted). The "question of improper venue is answered by taking a snapshot of the case at the time it is initiated: if it is 'proper' at that time, it remains 'proper' throughout the litigation." *Zappala v. Bandolini Prop. Mgmt., Inc.*, 909 A.2d 1272, 1281 (Pa. 2006) (emphasizing that, a review of a challenge to improper venue utilizes the record formed at the time the action was initiated).

Pursuant to Pennsylvania Rule of Civil Procedure 1006(a), an action against an individual may be brought only in a county in which

(1) the individual may be served;

(2) the cause of action arose;

(3) a transaction or occurrence took place out of which the cause of action arose;

(4) venue is authorized by law; or

(5) the property or a part of the property, which is the subject matter of the action, is located provided that equitable relief is sought with respect to the property.

Pa.R.Civ.P. 1006(a)(1-5). "If the plaintiff states more than one cause of action against the same defendant in the complaint pursuant to [Pennsylvania Rule of Civil Procedure] 1020(a), the action may be brought in any county in which any one of the individual causes of action might have been brought." Pa.R.Civ.P. 1006(f).

**Breach of Contract Claim**

Here, Appellants assert that they established venue under Rule 1006(a)(2) and (a)(3) and the trial court erred in sustaining the Scotts'

- 5 -

preliminary objection, which alleged the trial court lacked venue over Appellants' breach of contract claim. Appellants' Brief at 42-50. Appellants contend that the Settlement Agreement and Coal Owners Permission to Drill Letter were "accepted in, and executed by [Appellants] in[,] Allegheny County." *Id.* at 45. Through these agreements, Appellants assert that they formed contractual relationships between themselves and the Scotts and that these events constitute the requisite "transaction or occurrence" that supports venue over their breach of contract claim. *Id.* at 44. Appellants also argue that their breach of contract claim arose in Allegheny County because that is the county in which the DEP received letters and electronic mail ("email") correspondence from the Scotts which objected to Appellants' well permit applications and asked the DEP to reject Appellants' applications. *Id.* at 43-44.

It is well-established that "[a] contract is formed when the parties to it 1) reach a mutual understanding, 2) exchange consideration, and 3) delineate the terms of their bargain with sufficient clarity. Consideration consists of a benefit to the promisor or a detriment to the promisee." *Co. Image Knitware, Ltd. v. Mothers Work, Inc.*, 909 A.2d 324, 330 (Pa. Super. 2006), *appeal denied*, 929 A.2d 645 (Pa. 2007); *see also Shovel Transfer and Storage, Inc. v. Pennsylvania Liquor Control Bd.*, 739 A.2d 133, 136 (Pa. 1999) (stating, "a contract is created where there is mutual assent to the terms of [an agreement] by the parties with the capacity to contract"); *Accu-Weather, Inc. v Thomas Broad. Co.*, 625 A.2d 75, 78 (Pa. Super.

1993) (stating that, "for an agreement to exist, there must be a 'meeting of the minds,' [meaning that] that parties mutually assent to the same thing"). "As a general rule, signatures are not required unless such signing is expressly required by law or by the intent of the parties." ***Shovel Transfer***, 739 A.2d at 136. Nevertheless, "it is equally well-established that an offer may be accepted by conduct and what the parties do pursuant to the offer is germane to whether the offer is accepted." ***Accu-Weather***, 625 A.2d at 78 (original quotation marks and brackets omitted), *citing **Gum, Inc. v. Felton***, 17 A.2d 386, 389 (Pa. 1941).

Moreover, "to successfully maintain a cause of action for breach of contract requires that the plaintiff establish: (1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages." ***Gorski v. Smith***, 812 A.2d 683, 692 (Pa. Super. 2002), *appeal denied*, 856 A.2d 834 (Pa. 2004); ***see also Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.***, 137 A.3d 1247, 1258 (Pa. 2016).

For the purpose of examining whether venue in a breach of contract claim is proper, a "'[t]ransaction or occurrence' does not include the performance of any act in the contract formation process but[, rather, the term refers to] the ultimate formation of the contract itself." ***Pennsylvania Higher Educ. Assistance Agency v. Devore***, 406 A.2d 343, 344 (Pa. Super. 1979), *citing **Craig v. E.J. Thiele & Sons, Inc.***, 149 A.2d 35, 37 (Pa. 1959); ***see also Lucas Enter., Inc. v. Paul C. Harman Co., Inc.***, 417 A.2d 720,

721 (Pa. Super. 1980) (stating, "[t]he making of a contract, which takes place where the offer is accepted, undoubtedly constitutes a 'transaction or occurrence' sufficient to establish venue"); Pa.R.Civ.P. 1006(a)(3) (stating, venue is proper where "a transaction or occurrence took place out of which the cause of action arose"). In a breach of contract action, venue is established in the county where the operative transaction or occurrence (*i.e.*, the formation of the contract) occurred. The performance of ancillary aspects of the formation process will not establish venue. ***Deyarmin v. Consolidated Rail Corp.***, 931 A.2d 1, 11 (Pa. Super. 2007), *appeal denied*, 548 A.2d 805 (Pa. 2008); *see also **Harris v. Brill***, 844 A.2d 567, 571 (Pa. Super. 2004). Otherwise, permitting a suit to be commenced in any county "where any facet of a complex transaction occurred," would "only lead to confusion and forum shopping[.]" ***Harris***, 844 A.2d at 571.

Venue is also proper where "the cause of action arose[.]" Pa.R.Civ.P. 1006(a)(2). "In a contract case, a cause of action accrues when there is an existing right to sue forthwith on the breach of contract." ***Kessock v. Conestoga Title Insur. Co.***, 194 A.3d 1046, 1056 (Pa. Super. 2018) (original quotation marks omitted), *citing **Leedom v. Spano***, 647 A.2d 221, 226 (Pa. Super. 1994). Venue is, therefore, proper where a breach of the contract occurred. ***Lucas***, 417 A.2d at 721-722.

In determining that venue for Appellants' breach of contract claim was proper only in Greene County, and not in Allegheny County, the trial court stated,

[Appellants] began performance [of the Settlement Agreement] in Greene County by personally delivering payment in Greene County and by accessing the Scotts' property in Greene County, all on the same day the Scotts executed the [Settlement A]greement in Greene County. Neither party could have backed out of the [Settlement Agreement] after [Appellants] took these actions. Thus, because [Appellants] accepted the Settlement Agreement by performance in Greene County, and not by return promise in Allegheny County, the transaction or occurrence out of which the causes of action arose for [the breach of contract claim] occurred in Greene County.

Trial Court Opinion, 11/14/23, at 4.

Here, a review of the Settlement Agreement reveals that in exchange for the promises, covenants, and undertakings contained therein,

1.   Appellants agreed to pay the Scotts a total of $260,000.00 for consideration and damages;

2.   Appellants agreed to dismiss their Greene County lawsuit filed against the Scotts;

3.   The Scotts agreed "to permit [Appellants] and [their] contractors to enter the property and begin construction of a well pad;" and

4.   The Scotts agreed to execute (a) an Amendment and Ratification of Oil and Gas Lease, (b) a Surface Use [Easement] Agreement, and (c) a Coal Owner Permission to Drill Letter.

Amended Complaint, 2/7/23, at Exhibit D. The Settlement Agreement was executed by the parties and was dated May 23, 2019. *Id.* The signatures on the Settlement Agreement, however, were not witnessed by a notary public so as to indicate the county in which each party signed the Settlement Agreement. *Id.*

Per the terms called for under the Settlement Agreement, the Scotts also executed a Coal Owner Permission to Drill Letter on May 23, 2019, in which the Scotts granted Rice permission to drill 14 oil and gas wells, as described therein by longitude and latitude coordinates. *Id.* at Exhibit E. That same day, the Scotts also executed an Amendment and Ratification of Oil and Gas Lease document, which was dated May 23, 2019. *Id.* at Exhibit F. The notary seal affixed to the Amendment and Ratification document indicates that the Scotts executed the document in Greene County. *Id.* The Amendment and Ratification of Oil and Gas Lease document was executed by Appellants on May 29, 2019, in Allegheny County, as indicated by the notary seal affixed to the document. *Id.* On May 23, 2019, the Scotts also executed a Surface Use Easement Agreement in Greene County, as demonstrated by the notary seal affixed to the agreement. The Surface Use Easement Agreement was then executed by Appellants in Allegheny County on May 29, 2019. *See* The Scotts' Amended Preliminary Objections, 4/10/23, at Exhibit C.

In their amended complaint, Appellants asserted that "[p]ursuant to the terms of the Settlement Agreement, [EQT] paid the Scotts $260,000.00 as consideration under the Settlement Agreement." Amended Complaint, 2/7/23, ¶31. This averment does not detail the date on which the Scotts were paid by Appellants pursuant to the Settlement Agreement. In an affidavit, however, Douglas Scott attests that he and his wife were paid by Appellants on May 23, 2019, when a representative of EQT delivered the check to the Scotts after they signed the necessary documents called for under the terms

- 10 -

of the Settlement Agreement. *See* Affidavit of Douglas Scott, 2/27/23, at ¶¶2-3. Payment, in the form of a check, was delivered to the Scotts in Greene County. *Id.* at ¶3. We, therefore, concur with the trial court, and the record supports that the offer tendered by the Scotts upon their execution of, *inter alia*, the Settlement Agreement and the Coal Owners Permission to Drill Letter, was accepted by Appellants in Greene County upon Appellants' payment to the Scotts of the necessary funds called for under the terms of the Settlement Agreement. *See* Trial Court Opinion, 11/14/23, at 4; *see also Shovel Transfer*, 739 A.2d at 136; *Accu-Weather*, 625 A.2d at 78. As such, we discern no error of law or abuse of discretion in the trial court's determination that venue was proper in Greene County based upon the formation of the contract.

Nonetheless, we conclude that venue was also proper in Allegheny County because a breach of the parties' agreement occurred in Allegheny County. Pursuant to the Settlement Agreement, the Scotts agreed "to permit [Appellants] and [their] contractors to enter the [Scotts'] property and begin construction of the well pad." Settlement Agreement, 5/23/19, at ¶8. Pursuant to the Coal Owner Permission to Drill Letter, the Scotts granted "permission to [Rice] to drill the [] listed wells [(14 wells identified by longitude and latitude coordinates)] in the locations as detailed." Coal Owner Permission to Drill Letter, 5/23/19. According to the averments in Appellants' amended complaint, the Scotts (in 2019) permitted Appellants to enter the Scotts' property and drill 6 wells, which began producing oil and gas.

Amended Complaint, 2/7/23, at ¶37.  Disputes arose between the parties over, *inter alia*, the amount of royalties owed the Scotts by Appellants based upon well production.  *Id.* at ¶¶38-47.  This dispute led the Scotts to file a complaint against Appellants in Greene County in 2021.

On April 14, 2022, Appellants applied for permits to drill 5 additional wells on the Scotts' property.  *Id.* at ¶53.  On April 22, 2022, the Scotts filed an objection to Appellants' well permit applications with the DEP on the grounds that Rice failed to obtain a waiver from the Scotts to drill the 5 proposed wells at a distance closer than 1,000 feet from an existing well.[3]  *Id.* at ¶57; *see also id.* at Exhibit I.  On July 22, 2022, the Scotts supplemented their objection by stating that "the DEP should deny or stay the permit application until the pending litigation between the parties [(referring to the Scotts' 2021 complaint against Appellants)] is resolved."  *Id.* at Exhibit L.  The Scotts' objections were communicated *via* letters mailed to, and received by, the DEP at its Southwest Regional Office located in Allegheny County.  *See id.* at Exhibits I and L.  Appellants further averred that the DEP advised Appellants that, although their permit applications satisfied "all necessary

_____

[3] Section 507(a) of the Coal and Gas Resource Coordination Act states that "[n]o permit for a gas well covered by this [A]ct may be issued to drill a new gas well, or reopen a gas well which has been plugged in accordance with the Oil and Gas Act, [(58 Pa.C.S.A. § 3201 *et seq.*)] unless the proposed gas well is located not less than 1,000 feet from any other well.  For the purpose of this section, "other well" shall not include[, *inter* alia,] any[ o]il or gas well or injection well which does not penetrate a workable coal seam."  58 P.S. § 507(a)(1) (paragraph formatting modified).

technical criteria for issuance[,]" the DEP would not issue the permits "due to the Scotts' objection."[4]  **Id.** at ¶¶58-59.  In support of their breach of contract claim, Appellants allege that the Scotts breached the Settlement Agreement and Coal Owner Permission to Drill Letter when the Scotts filed objections to Appellants' well permit applications with the DEP.  **Id.** at ¶¶137-138.

Based upon the allegations contained in Appellants' amended complaint filed in February 2023, the Scotts agreed in the Settlement Agreement and Coal Owner Permission to Drill Letter to permit Appellants to drill 14 wells on their property.  Appellants assert that the Scotts breached their contractual commitments when they filed objections with the DEP concerning Appellants' well permit applications.  The Scotts' objections to the well permit applications were raised in letters received by the DEP at its Southwest Regional Office in Allegheny County.  As such, a breach of contract action accrued and Appellants' right to sue the Scotts emerged when the DEP received the Scotts' objection letters at its offices in Allegheny County.  Because the alleged breach of contract cause of action arose in Allegheny County, venue is also proper in Allegheny County.  **See** Pa.R.Civ.P. 1006(a)(2); **see also Kessock**, 194 A.3d at 1056; **Lucas**, 417 A.2d at 721-722.

**Negligent Misrepresentation Claim**

---

[4] Ultimately, Appellants filed modified well permit applications for the 5 proposed wells, and the DEP granted the modified well permit applications on August 23, 2022.  Amended Complaint, 2/7/23, at ¶¶96-97.

Next, Appellants assert that the trial court erred in finding that venue in Allegheny County was improper on their cause of action for negligent misrepresentation. Appellants' Brief at 40-43. Appellants claim that "[t]he tortious acts underlying [their] negligent misrepresentation claim occurred when the Scotts sent two letters and multiple emails to the DEP's Allegheny County office[.]" *Id.* at 40. According to Appellants, the communications sent by the Scotts "contain[ed] material misrepresentations regarding [the Scotts'] interests in production units." *Id.* Appellants contend that the trial court erred in concluding that "the only concrete example of [the Scotts'] misrepresentations which [Appellants pled were] the filing of various civil actions in Greene County." *Id.* (record citation, original brackets omitted). Appellants also allege that the Scotts "made statements to the DEP that the Scotts knew or should have known were false because [the] public record demonstrated the Scotts did not possess the interests they claimed." *Id.* at 41. Appellants argue that the Scotts made "misrepresentations to the DEP in Allegheny County with the intent to induce the DEP to rely on [the misrepresentations] to delay or deny [Appellants'] permits" and, in fact, the DEP "did rely on the Scotts['] statements in delaying issuance of the permits, resulting in injury to [Appellants]." *Id.* at 42.

> The elements of a common law claim for negligent misrepresentation are: (1) a misrepresentation of a material fact; (2) made under circumstances in which the misrepresenter ought to have known its falsity; (3) with an intent to induce another to act on it; and (4) which results in injury to a party acting in justifiable reliance on the misrepresentation.

- 14 -

*Gongloff Contracting, L.L.C. v. L. Robert Kimball & Assocs., Architects, and Eng'rs, Inc.*, 119 A.3d 1070, 1076 (Pa. Super. 2015) (quotation marks omitted), *quoting* *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 277 (Pa. 2005). "[T]he misrepresentation must concern a material fact and the speaker need not know his or her words are untrue, but must have failed to make a reasonable investigation of the truth of these words." *Milliken v. Jacono*, 60 A.3d 133, 141 (Pa. Super. 2012) (citation omitted).

Like any cause of action in negligence, the allegations must "establish the breach of a legally recognized duty or obligation that is causally connected to the damages suffered by the complainant." *Bilt-Rite*, 866 A.2d at 280 (stating, "[t]he primary element in any negligence cause of action is the defendant owes a duty of care to the plaintiff"); *see also Milliken*, 60 A.3d at 141 (reiterating that, "like any action in negligence, there must be an existence of a duty owed by one party to another" (citation and emphasis omitted)). "In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection from the harm suffered[.]" *Bilt-Rite*, 866 A.2d at 281 (original quotation marks and citation omitted). "The concept of duty in the tort setting can be intertwined with contractual notions of privity[] where the task is to determine whether the relationship between the parties gives rise to a duty." *Id.* at 280, *quoting* *Althaus ex rel. Althaus v. Cohen*,

756 A.2d 1166, 1169 (Pa. 2000). Moreover, economic losses resulting from negligent misrepresentation are an exception to the economic loss doctrine which provides "that tort law is not intended to compensate parties for losses suffered as a result of a breach of duties assumed only by [contractual] agreement." ***Bilt-Rite***, 866 A.2d at 283-285 (citation and original brackets omitted).

In finding that venue based on Appellants' negligent misrepresentation claim was proper only in Greene County, the trial court explained,

> Because [Appellants'] negligent misrepresentation claim relies on a negligent act or omission that occurred in Greene County, there is no independent basis for venue in Allegheny County. The only concrete examples of [the Scotts'] misrepresentations which [Appellants] plead are the filing of various civil actions in Greene County. Otherwise, [Appellants] allege the Scotts reiterated the contents of those actions in communications to [Appellants] and others. There is no reasonable inference to be drawn from [Appellants'] well-pleaded facts that the Scotts made any such representation in Allegheny County. Indeed, [Appellants] attempt to claim venue is proper not because of any action by the Scotts in Allegheny County, but rather because the Scotts made statements to individuals working [or] residing in Allegheny County and because the harm caused by [the Scotts'] actions occurred in Allegheny County. Thus, because [Appellants'] well-pleaded facts and reasonable inferences therefrom do not indicate any of [the Scotts'] alleged negligent acts or omissions occurred in Allegheny County, there is no independent basis for venue.

Trial Court Opinion, 11/14/23, at 5-6.

Here, as discussed *supra*, Appellants' allegations demonstrated that the Scotts owed a duty to Appellants to permit Appellants to enter the Scotts' property and drill oil and gas wells in 14 designated areas. ***See*** Settlement

Agreement, 5/23/19; *see also* Coal Owners Permission to Drill Letter, 5/23/19. The Scotts' legal duty to Appellants included not simply the affirmative rights involving access to land and the drilling of wells but also the implied promise that the Scotts would not interfere with Appellants' efforts to exercise their contractual rights, including entry onto the Scotts' property to drill wells. Therefore, the allegations contained in Appellants' amended complaint support the conclusion that the Scotts owed a duty to Appellants which would support a negligent misrepresentation claim. *Bilt-Rite*, 866 A.2d at 281 (stating that, a duty in tort law may stem from the contractual relationship between the parties).

To plead their negligent misrepresentation cause of action, Appellants asserted that the Scotts made material misrepresentations regarding, *inter alia*, the calculation of production royalties, the status of the Scotts' 2021 complaint against Appellants, and their interest in production units which caused the Scotts to claim they were underpaid concerning production royalties. Amended Complaint, 2/7/13, at ¶¶142-146. Appellants further asserted that these material misrepresentations were communicated to Appellants, as well as "others." *Id.* Appellants allege that the Scotts, upon, *inter alia*, a review of public records, should have known their representations

were false and that, as a result of the Scotts' misrepresentations, Appellants incurred economic losses.[5]  *Id.* at ¶¶151, 155.

In support of their claim, and by way of incorporation, Appellants averred that the Scotts communicated material misrepresentations to the DEP in letters and emails as part of the Scotts' objections to Appellants' well permit applications.  *See* Amended Complaint, 2/7/23, at ¶¶57, 92-93.  In particular, Appellants asserted that the Scotts discussed their 2021 complaint against Appellants with the DEP.  *Id.* at ¶¶92-93.  In sum, Appellants' amended complaint alleged that, after the DEP received the Scotts' objections - which included material misrepresentations about the calculation of production royalties, the status of the Scotts' 2021 complaint against Appellants, and the Scotts' interest in production units - the DEP delayed approval of Appellants' permit applications and caused Appellants to incur losses arising from, *inter alia*, delays in their drilling schedule.

A review of the record reveals that, in a letter dated July 22, 2022, the Scotts represented to the DEP that they filed the 2021 complaint against

---

[5] Appellants alleged that their economic losses were in the form of "expending substantial time and money examining and evaluating the purported issues with the Scotts' royalty payments and interacting with the Scotts regarding the alleged underpayment of royalties, as well as their efforts to obtain administrative closure of the 2021 Action" and "incurring substantial costs to respond to the Scotts' objections to [Appellants'] well permit applications and otherwise engage in proceedings before the DEP with respect to these permits, as well as incurring substantial costs for contingency planning should the permits not have been issued as a result of the Scotts' objections."  Amended Complaint, 2/7/23, at ¶¶140, 155.

- 18 -

Appellants because Appellants violated their contractual obligations concerning the oil and gas wells on the Scotts' property. *Id.* at Exhibit L. In particular, the Scotts informed the DEP that

> [Appellants] remain[] in violation of the Settlement Agreement and Amended Lease by, without limitation: (i) failing to pay the Scotts any royalty for [oil and gas] wells [in certain units of the property] although the [Scotts' p]roperty is unitized in those units and those units state that they contain [] producing [oil and gas] wells, (ii) for grossly undercalculating royalties for [certain oil and gas wells], (iii) failing to make royalty payments pursuant to the express terms of the lease, (iv) making false representations to the Scotts regarding payments, and (v) taking unlawful deductions from the royalty payment owed.

*Id.* The Scotts further informed the DEP that they "have suspended their performance under the Settlement Agreement and have revoked any prior consent given to [Appellants] to drill the proposed [oil and gas w]ells on the [p]roperty as contemplated by the terms of the Settlement Agreement." *Id.* (footnote omitted). The Scotts reiterated similar allegations in email correspondence between Appellants, the DEP, and the Scotts.[6] *Id.* at Exhibit M. As a result of the Scotts' objections and correspondence, the DEP asked the parties to describe whether, and if so, how, the Scotts' 2021 complaint was related to the Scotts' objections to the well permit applications, *i.e.* was the Scotts' 2019 consent to enter the property and drill no longer valid, or if the 2021 complaint related to collateral matters. *Id.* Thus, it is evident from

---

[6] The Scotts' email correspondence was sent to, *inter alia*, the assistant counsel for the DEP in the Southwest Regional Office. *See* Amended Complaint, 2/7/23, at Exhibit M.

- 19 -

the email correspondence that the Scotts' references to, and interjection of, the allegations of the 2021 complaint impacted the well permit application process. Importantly, for purpose of venue, the DEP received the Scotts' letters and emails at its Southwest Regional Office in Allegheny County. Therefore, Appellants' cause of action for negligent misrepresentation arose from events and circumstances, *i.e.*, the receipt of letters and emails by the DEP, that occurred in Allegheny County. As such, venue, as it pertains to Appellants' negligent misrepresentation cause of action, was proper in Allegheny county. *See* Pa.R.Civ.P. 1006(a)(2).

**Tortious Interference with Contractual Relations Claim**

Next, Appellants challenge the trial court's determination that they failed to establish venue in Allegheny County over their claims asserting tortious interference with contractual relations. Appellants' Brief at 29-33. Appellants contend that "the Scotts tortiously interfered with [Appellants'] contracts with [third-party] drilling companies by, among other things, tortiously objecting to [Appellants'] well permit applications and wrongfully advocating that the DEP deny the applications[.]" *Id.* at 30. Appellants argue that the Scotts' letters and emails to the DEP's Allegheny County offices "constitute[] a purposeful and tortious act intended to harm [Appellants'] third-party drilling contracts, which were dependent upon the DEP's continued approval of permits [to allow] drilling to proceed." *Id.* at 30-31. Appellants assert that the trial court disregarded the Scotts' tortious acts (*i.e.*, the sending of letters and emails to the DEP) "and, in so doing, [the trial court] failed to focus on

where 'the cause of action arose'" *Id.* at 31 (stating, "the trial court looked at the 'location' of every element of a tortious interference claim **except** for the one that matters" (emphasis in original)).

"[A] party is liable for pecuniary loss due to tortious interference with a contractual relationship when the party intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person by inducing or otherwise causing the third person not to perform the contract[.]" *Empire Trucking Co., Inc. v. Reading Anthracite Coal Co.*, 71 A.3d 923, 932 (Pa. Super. 2013) (original quotation marks and ellipsis omitted), *citing* *Walnut St. Assoc., Inc. v. Brokerage Concepts, Inc.*, 982 A.2d 94, 98 (Pa. Super. 2009), *affirmed*, 20 A.3d 468 (Pa. 2011). To establish a claim for tortious interference with a contractual relationship, a party must show:

> (1) [t]he existence of a contractual relationship between the complainant and a third party; (2) an intent on the part of the defendant to harm the plaintiff by interfering with that contractual relationship; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage as a result of defendant's conduct.

*Empire*, 71 A.3d at 933 (original brackets omitted).

In sustaining the Scotts' preliminary objection as to improper venue of the tortious interference claim in Allegheny County, the trial court explained,

> As [Appellants'] tortious interference claim relies on complex transactions in or relating to Greene County, and only a mere facet of it involves Allegheny County, there is no independent basis for venue in Allegheny County. First, [Appellants] allege merely that "EQT entered into contracts with four companies to drill and

complete" the wells on the Scotts' property, and that "multiple other contracts were also entered into in support of the drilling and completion" of the wells. This factual pleading does not state, nor permit the reasonable inference of, contractual obligations that existed in Allegheny County; in fact, they permit the inference that these obligations relate to performance in Greene County.

Second, [the Scotts'] alleged intent to harm [Appellants] must have occurred outside of Allegheny County, as they live in Fayette County, the property at issue is in Greene County, and [Appellants] do not allege any facts that this occurred in Allegheny County. Moreover, [the Scotts'] alleged interference, from the face of [Appellants' amended] complaint, occurred in Greene County. [Appellants specifically cite] Exhibit I, a letter from [the Scotts'] then-counsel[, whose office is located] in Waynesburg, Greene County, as the means by which [the Scotts'] tortiously interfered.

Third, for [the Scotts] to have a "privilege or justification," such privilege or justification would exist in Greene County, not Allegheny County. [The Scotts] alleged in their [objections to the well permit applications filed with] the DEP that [Appellants] failed to fulfill their obligations under the Settlement Agreement, which was formed and accepted in Greene County.

Fourth, the actual damage suffered by [Appellants] would relate to their profits from drilling in Greene County, their contractual obligations related to [the Scotts'] property in Greene County, and contracts formed with third parties, again in relation to the Greene County property. The only basis on which [Appellants] claim venue exists [in Allegheny County] for tortious interference is, in essence, that [Appellants] are headquartered in Allegheny County. But this is - at most - a mere facet of the complex transactions giving rise to [Appellants'] claim, and thus cannot serve as a basis for venue.

Trial Court Opinion, 11/14/23, at 6-7 (extraneous capitalization, original brackets, and ellipses omitted).

Here, Appellants assert that proper venue "hinges" on where the alleged tortious act – the dissemination of letters and emails to the DEP in Allegheny County – took place. Therefore, we limit our review to whether, or not, the

trial court erred or abused its discretion in applying venue principles to the second element of Appellants' tortious interference claim. In other words, our inquiry focuses on the location where the Scotts formed and manifested the intent to harm Appellants by interfering with their contractual relationships.

The second element of a tortious interference claim - an intent on the part of the defendant to harm the plaintiff by interfering with contractual relationships – requires the defendant to act "for the specific purpose of causing harm to the plaintiff." **Empire**, 71 A.2d at 933; **see also** RESTATEMENT (SECOND) OF TORTS § 766 cmt. J (1979) (stating, an actor acts with the necessary intent if he or she "acts for the purpose of interfering with the performance of the contract" or if he or she "desires to interfere, even though he [or she] acts for some other purpose").[7] Section 8(A) of the Restatement (Second) of Torts defines "intent" as denoting "that the actor desires to cause consequences of his [or her] acts, or that he [or she] believes the consequences are substantially certain to result of it." RESTATEMENT (SECOND) OF TORTS § 8(A) (1965).

> All consequences which the actor desires to bring about are intended, as the word is used in this Restatement. Intent is not, however, limited to consequences which are desired. If the actor knows that the consequences are certain, or substantially certain, to result from his [or her] act, and still goes ahead, he [or she] is treated by the law as if he [or she] had in fact desired to produce the result. As the probability that the consequences will follow

---

[7] Our Supreme Court adopted Section 766 of the Restatement (Second) of Torts in **Adler, Barish, Daniels, Levin & Creskoff v. Epstein**, 383 A.2d 1175 (Pa. 1978), ), *appeal dismissed and cert. denied*, 442 U.S. 907 (1979).

decreases, and becomes less than substantial certainty, the actor's conduct loses the character of intent, and becomes mere recklessness[.]

RESTATEMENT (SECOND) OF TORTS § 8(A) cmt. b. (1965). As such, an actor also acts with the necessary intent if he or she "does not act for the purpose of interfering with the contract or desire [the interference] but knows that the interference is certain or substantially certain to occur as a result of his [or her] action." RESTATEMENT (SECOND) OF TORTS § 766 cmt. J (1979); **see also Sortino v. Washinton Hosp.**, 2020 WL 7391940, at *7 (Pa. Super. 2020) (unpublished memorandum).

In the case *sub judice*, Appellants, in their amended complaint, averred that in order to drill the additional oil and gas wells, Appellants entered into contracts with third-party companies for, *inter alia*, the use of, and operation of, drilling rigs and machinery to hydraulically fracture the wells. Amended Complaint, 2/7/23, at ¶¶60-67. Specifically, Appellants averred,

68. All of these contracts - for drilling, completions, and supporting operations – are coordinated to allow for the specific timing of development of the [additional oil and gas wells on the Scotts' property] in conjunction with [Appellants'] development of additional, nearby wells.

69. [Appellants] create[d] this drilling schedule far in advance of actual drilling, as prior to and subsequent to the development of the [additional oil and gas wells on the Scotts' property], the drilling rigs and completion crews are scheduled to work on other wells.

70. Drilling all of their wells as scheduled is imperative to [Appellants] in order to ensure that their long-planned drill schedules, remain intact.

*Id.* at ¶¶68-70. Appellants alleged that "the Scotts were aware of the nature of [Appellants'] contractual relationships with their drilling, completion, and other vendors[.]" *Id.* at ¶¶71, 160. Appellants further alleged that the Scotts, having no basis for their objections to the additional oil and gas wells, filed objections with the DEP with the specific intent to harm Appellants by delaying their drilling efforts and disrupting their long-planned drilling schedules. *Id.* at ¶¶16-163. In particular, Appellants cite to Exhibit I of the amended complaint - the Scotts' April 22, 2022 objection letter sent to the DEP - as establishing the Scotts' specific intent to interfere with Appellants' contractual relationships with the third-party drilling companies. *Id.* at ¶161; *see also id.* at Exhibit I.

Upon review, we discern no abuse of discretion or error of law in the trial court's conclusion that the Scotts' "alleged interference, from the face of the [amended] complaint, occurred in Greene County." Trial Court Opinion, 11/14/23. The Scotts' objection letter, dated April, 22, 2022, was written by the Scotts' then-counsel from his law offices in Greene County. It is the writing of this letter, not the receipt of the letter by the DEP, that demonstrates the Scotts' specific intent to interfere with Appellants' third-party contractual relationships. Similarly, the Scotts' email correspondence originated from their then-counsel, whose law offices were in Greene County. Stated differently, the Scotts' specific intent was formed (and, for venue purposes, occurred) at the moment the letter and emails were

written in Greene County, not when the letter and emails were received by the DEP in Allegheny County.

## Abuse of Process Claim

Finally, Appellants argue that "[v]enue is proper in Allegheny County [on their abuse of process claim] because the Scotts committed tortious acts or omissions [in Allegheny County] when they sent allegations from their 2021 [complaint] to the DEP – unlawfully using that lawsuit to obstruct the DEP's issuance of drilling permits to [Appellants]." Appellants' Brief at 33. Within the context of their abuse of process claim, Appellants contend that the trial court erred as a matter of law when it analyzed Appellants' venue choice in Allegheny County. In particular, Appellants maintain that the trial court erred in assessing venue under the standard used to determine whether, or not, venue is proper in a claim alleging wrongful use of civil proceedings, a separate and distinct legal theory. *Id.* at 35-36 (stating, "[t]he trial court failed to reach that straightforward conclusion[ - the tortious act that gave rise to the abuse of process claim 'plainly occurred in Allegheny County' - ]based on its view that 'the appropriate consideration when determining venue in a claim of wrongful use of civil proceedings is the location of the underlying litigation'"). Appellants assert that the Scotts filed a first amended complaint in their 2021 lawsuit against Appellants in Greene County shortly before filing objections with the DEP concerning Appellants' well permit applications. *Id.* at 34. Appellants aver that the Scotts used "their falsity-laden 2021 [l]awsuit" as grounds for their permit objections before the DEP and "in an effort to obstruct

and delay the DEP's issuance of permits to [Appellants]." *Id.* Appellants assert that the "misuse of the 2021 [l]awsuit was indisputably directed to, addressed to, and received by the DEP in Allegheny County." *Id.* at 35, 37.

Appellants' contention that the trial court in Allegheny County had venue over their abuse of process claim distinguishes between the theories of abuse of process and wrongful use of civil proceedings. It is well-established that "[a]n action for wrongful use of civil proceedings differs from an action for abuse of process." *Hart v. O'Malley*, 647 A.2d 542, 546 (Pa. Super. 1994).[8]

The common law tort of abuse of process

is defined as the use of legal process against another primarily to accomplish a purpose for which it is not designed. To establish a claim for abuse of process it must be shown that the defendant (1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed; and (3) harm has been caused to the plaintiff.

_____

[8] By way of example, this Court long-ago explained that

The prime distinction between the two torts is that in actions for [wrongful] use of [civil] process the original issuance of process cannot be justified on the facts, but the process is used in the manner in which the law contemplated its use. If the plaintiff has no cause of action against the defendant but nonetheless maliciously brings suit against him, [or her,] the action is a [wrongful] use of [civil proceedings]. In actions for [] abuse of process the original issuance of the process was justified but the process itself was put to an illegal use. If the plaintiff sues the defendant on a valid cause of action but brings the suit, for example, not to collect his[, or her,] just debt but for a collateral purpose such as blackmail the action is [an] abuse of process.

*Weiss v. Equibank*, 460 A.2d 271, 276 (Pa. Super. 1983).

*P.J.A. v. H.C.N.*, 156 A.3d 284, 288 (Pa. Super. 2017) (citation omitted),

*appeal denied*, 170 A.3d 1019 (Pa. 2017).

Pennsylvania has codified the civil tort of wrongful use of civil

proceedings as follows:

### § 8351.  Wrongful use of civil proceedings

**(a) Elements of action.** - A person who takes part in the procurement, initiation[,] or continuation of civil proceedings against another is subject to liability to the other for wrongful use of civil proceedings:

(1) he acts in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties[,] or adjudication of the claim in which the proceedings are based; and

(2) the proceedings have terminated in favor of the person against whom they are brought.

42 Pa.C.S.A. § 8351(a).  Thus, to assert a cause of action for wrongful use of

civil proceedings, a plaintiff must establish (1) the underlying proceeding was

terminated in his or her favor; (2) the defendant caused those proceedings to

be instituted against the plaintiff without probable cause; and (3) the

proceedings were instituted primarily for an improper cause.  *P.J.A.*, 156 A.3d

at 292.

The abuse of process tort

differs from that of wrongful use of civil proceedings [such] that, in [an abuse of process claim], the existence of probable cause to employ the particular process for its intended use is immaterial. The gravamen of abuse of process is the perversion of the particular legal process for a purpose of benefit to the defendant, which is not an authorized goal of the procedure.  In support of

this claim, [the plaintiff] must show some definite act or threat not authorized by the process, or aimed at an objective not legitimate in the use of the process[.  T]here is no liability where the defendant has done nothing more than carry out the process to its authorized conclusion, even though with bad intentions.

*Shiner v. Moriarty*, 706 A.2d 1228, 1236 (Pa. Super. 1998) (citations, original brackets, and quotation marks omitted), *appeal denied*, 729 A.2d 1130 (Pa. 1998); *see also Lerner v. Lerner*, 954 A.2d 1229, 1238 (Pa. Super. 2008).  "Abuse of process is, in essence, the use of legal process as a tactical weapon to coerce a desired result that is not the legitimate object of the process."  *P.J.A.*, 156 A.3d at 288.

In finding that Allegheny County was an improper venue for Appellants' abuse of process claim, the trial court explained,[9]

"The appropriate consideration when determining venue in a claim of wrongful use of civil proceedings is the location of the underlying litigation."  *Harris*[, 844 A.2d at 570,] *citing Kring v. U*[*niv. of*] *Pittsburgh*, 829 A.2d 673, 678 (Pa. Super. [] 2003)[.]

[The Scotts] argue the only proper venue for [the abuse of process claim and the wrongful use of civil process claim] lies in Greene County, as the underlying civil matter was filed in Greene [County.  Appellants], on the other hand, cite to *Baylson v. Genetics & IVF Inst.*[, 110 A.3d 187 (Pa. Super. 2015)] to claim that a [wrongful use of civil process] claim can be filed seemingly anywhere.

[Appellants'] argument misreads *Baylson*.  In *Baylson*, [this Court] held that a [wrongful use of civil process] claim arising from

_____

[9] As discussed more fully *infra*, within a single discussion, the trial court examined the propriety of venue over two distinct claims (abuse of process and wrongful use of civil proceedings) but, in so doing, applied only a single standard – the standard for determining whether, or not, venue is proper in a wrongful use of civil proceedings cause of action.

a Montgomery County[, Pennsylvania,] proceeding was proper in Philadelphia County[, Pennsylvania,] because the [Genetics and IVF Institute] "had an office in Philadelphia and regularly conducted business there." [***Baylson***,] 110 A.3d [at] 190[,] *citing* Pa.R.Civ.P. 2179[. Appellants] do not allege that venue is proper in Allegheny County for their [wrongful use of civil process] claim[] on any similar grounds - nor can they, as that specific provision applies only to corporate defendants, not individual defendants. Because the cause of action for [Appellants' wrongful use of civil process] claim[] arose out of Greene County, venue is improper in Allegheny County.

Trial Court Opinion, 11/14/23, at 7-8.

In the case *sub judice*, Appellants, recognizing a distinction between an abuse of process claim and a wrongful use of civil proceedings claim, challenge only the trial court's venue determination with respect to their abuse of process claim. Appellants' Brief at 33-40. In our analysis *infra*, we review extensively the procedural history of litigation between the parties and the allegations Appellants offer to establish venue over their abuse of process claim. This extensive review is necessary in order to (1) identify the "legal process" (*i.e.*, the Scotts' 2021 complaint) that forms the basis of Appellants' abuse of process claim, (2) demonstrate and develop a context to understand why the purpose for which the Scotts' 2021 complaint was used (*i.e.*, to delay the DEP well permit approval process) was not one for which the legal process was designed, and (3) recount how Appellants have been harmed by the misuse of this legal process. In view of the differences between the torts – abuse of process and wrongful use of civil proceedings – Appellants have averred a sufficient basis to find that venue in Allegheny County was proper over their abuse of process claim.

Appellants, in their amended complaint, alleged that the Scotts filed the 2021 complaint against Appellants, asserting, *inter alia*, that Appellants incorrectly calculated the Scotts' interests in certain then-existing oil and gas wells and, in addition, underpaid the Scotts their royalties from the well production. Amended Complaint, 2/7/23, at ¶¶38-42. Appellants alleged that "the Scotts failed to pay the proper fee to effectuate valid service" of the 2021 complaint, and "[d]espite being on notice that the 2021 [c]omplaint was not served, the Scotts made no further attempts to serve the 2021 [c]omplaint during the remainder of 2021[,] and the first half of 2022." *Id.* at ¶¶46-47. In April 2022, Appellants filed well permit applications with the DEP, and, that same month, the Scotts filed objections with the DEP pertaining to Appellants' well permit applications. *Id.* at ¶¶53-57. Appellants averred that the DEP would not issue the permits to Appellants as a result of the Scotts' objections and this delayed and disrupted Appellants' production and drilling schedules with third-party contractors. *Id.* at ¶¶59-71.

Appellants allege that on July 6, 2022, they filed a declaratory judgment action against the Scotts, asking the Greene County trial court to prohibit the Scotts from objecting to the well permit applications based upon, *inter alia*, the Settlement Agreement and Coal Owners Permission to Drill Letter. *Id.* at ¶¶72-73. In response to Appellants July 6, 2022 declaratory judgment action against the Scotts, Appellants contend the Scotts filed a motion for rule to show cause why Appellants' declaratory judgment action should not be dismissed as duplicative of the Scotts' 2021 complaint. *Id.* at ¶¶76-79.

Appellants assert that, as of July 2022, the Scotts' 2021 complaint was not "active or pending" because the Scotts failed to perfect service of the action against Appellants. *Id.* at 80.

Appellants allege that on July 15, 2022, nine days after Appellants filed the declaratory judgment action against the Scotts, the Scotts purported to file an amended complaint in their 2021 lawsuit against Appellants without first seeking leave of court or consent of the defendant-parties. *Id.* at ¶¶83-85. Appellants agree that Rice was served with the first amended complaint on July 19, 2022, and EQT was served with the first amended complaint on August 9, 2022. *Id.* at 89-90. Appellants assert that the Scotts then discussed their 2021 lawsuit against Appellants with the DEP in subsequent objection letters and email correspondence concerning the issuance of the well permit applications. *Id.* at ¶¶92-95. Ultimately, the DEP granted Appellants' well permit applications on August 23, 2022. *Id.* at ¶97.

Appellants assert that, in August 2022, Appellants "provided information to [the Scotts] that again demonstrated that the allegations in the Scotts' 2021 [c]omplaint and the Scotts' defenses [to Appellants' 2022 declaratory judgment complaint] were based on stale and superseded information of public record." *Id.* at ¶100. Appellants aver that on August 25, 2022, the Scotts filed an unverified second amended complaint that "continued to assert the same causes of action against [Appellants], alleging the underpayment of royalties, [] without any substantiating facts." *Id.* at ¶106.

Appellants aver that, on September 22, 2022, the Scotts appealed the DEP's issuance of the well permits to the Pennsylvania Environmental Hearing Board. *Id.* at ¶107. Appellants contend that "[i]n their appeal, the Scotts [continued to allege] they were entitled to revoke their consent to drill these wells based on [Appellants] breach of the Lease as alleged in the 2021 action." *Id.* at 108. While the Scotts' appeal was pending, the Court of Common Pleas of Greene County administratively closed the Scotts' 2021 action against Appellants. *Id.* at ¶¶109-112.

In support of their cause of action for abuse of process in the case *sub judice*, Appellants alleged that,

173. The Scotts' object in purporting to file the first amended complaint in the 2021 action was to delay the DEP proceedings rather than pursu[e] the legitimate goal of litigating that lawsuit as evidenced by, among other things, their filing of the first amended complaint immediately prior to the date drilling was scheduled to begin, and only after the filing of [Appellants'] 2022 [declaratory judgment] action, despite the 2021 action having sat dormant for nearly a year at that point and the Scotts never properly effectuating service of the [original] complaint.

174. [Appellants] incurred harm by expending money and time to litigate a frivolous suit, as well as the substantial costs they incurred to respond to the Scotts' objections to their well permit applications and otherwise engage in proceedings before the DEP with respect to these permits and for contingency planning should the permits not have been issued as a result of the Scotts' conduct.

*Id.* at ¶¶173-174.

Upon review, we concur with the trial court, and the record supports, that venue for Appellants' wrongful use of civil process cause of action properly

lies in Greene County. Greene County was the forum where the Scotts filed the 2021 complaint, although they failed to properly serve the complaint on Appellants, and Greene County was where the 2021 complaint was terminated by the trial court's administrative closure of the case. Therefore, Greene County was the proper venue for the wrongful use of civil process cause of action. *See Harris*, 844 A.2d at 572 (finding venue was proper for a wrongful use of civil process action in the county where the underlying action was continued **and** terminated); *see also Kring*, 829 A.2d at 678 (finding that, a cause of action for wrongful use of civil process arose in the county where the action was terminated and, therefore, venue was proper in the county were the termination of the underlying action occurred).

We, however, are constrained to find that the trial court erred as a matter of law when it failed, separately, to consider venue as it related to the abuse of process cause of action and failed to distinguish its analysis between the two separate and distinct causes of action – wrongful use of civil proceedings and abuse of process. *See* Trial Court Opinion, 11/14/23, at 7-8. As discussed *supra*, to establish an abuse of process cause of action, Appellants must show that the Scotts used a legal process against Appellants, that the primary purpose of the legal process was for a purpose other than what the legal process was designed to achieve, and that Appellants suffered harm. *See P.J.A.*, 156 A.3d at 288. Where a tort requires, as an element, a showing of injury or harm, such as in the case of an abuse of process claim, the cause of action for such a tort does not arise until the injury has occurred.

*Kring*, 829 A.3d at 677, *discussing* **Emert v. Lamari Corp.**, 200 A.2d 901 (Pa. 1964). Therefore, venue based upon where the cause of action arose is proper only in the county where the injury or harm occurred. **Kring**, 829 A.3d at 677.

As Appellants allege, and the record supports, the Scotts attempted to initiate legal proceedings against Appellants by filing the 2021 complaint in Greene County. According to Appellants' amended complaint in the case *sub judice*, the Scotts failed to perfect service of their 2021 complaint and the complaint lay dormant until July 2022, when the Scotts filed a first amended complaint in Greene County. Appellants assert that the Scotts filed their first amended complaint in Greene County "to delay the DEP process [of approving Appellants' well permit applications] rather than pursue the legitimate goal of litigating [the underlying] lawsuit." Amended Complaint, 2/7/23, at ¶173. Appellants further allege that they incurred drilling delays and expenses, *inter alia*, in responding to the Scotts' objections to the well permit applications. *Id.* at ¶174.

A review of the July 22, 2022 objection letter the Scotts sent to the DEP, which was sent after the Scotts filed an amended complaint in their 2021 lawsuit against Appellants, reveals that the Scotts attached to their objection letter copies of the 2021 complaint and the July 2022 amended complaint. *Id.* at Exhibit L (page 2, fn. 1). The Scotts further requested in their objection letter that "the DEP [] deny or stay the permit application until the pending litigation between the parties is resolved." *Id.* at Exhibit L (page 1). The

Scotts also referenced their pending litigation against Appellants in email correspondence sent to the DEP, raising the pending litigation as a ground to stay the DEP's decision on whether, or not, to issue the well permits. *See id.* at Exhibit M (email of July 19, 2022, 5:58 p.m.). A review of the email correspondence between Appellants, the Scotts, and the DEP demonstrates that the DEP's decision to grant, or deny, Appellants' well permit applications was delayed by the Scotts' objections based upon the 2021 complaint. *See id.* at Exhibit M (email of July 14, 2022, from Assistant Counsel for the DEP) (stating, "It is unclear from your [email, referring to an email sent by the Scotts] whether the litigation is directly related to the objection submitted. Please describe whether this litigation is on point with the objection that the [Scotts'] 2019 consent [to drill] is no longer valid, or if [the litigation] is in regard[] to some other collateral matter.").

The DEP's delay in ultimately issuing the well permits was due to the Scotts' objections, which were premised, in part, on the Scotts' contention that their 2021 lawsuit against Appellants needed to be resolved before issuance of the well permits. According to Appellants' amended complaint, the delay in the issuance of the well permits and the steps that Appellant had to undertake in order to ultimately obtain well permits caused harm to Appellants. The potential harm to Appellants, therefore, occurred in Allegheny County where the DEP offices are located and where the DEP, based upon receipt of the Scotts' objection letters and email correspondence, delayed its

review and decision surrounding Appellants' well permit applications. As such, Appellants' cause of action arose in Allegheny County.

Moreover, the Scotts' actions – including the dissemination of an objection letter and email correspondence referencing the 2021 litigation against Appellants – occurred in Allegheny County because Allegheny County was where the DEP received, reviewed, and considered the objecting correspondence as part of the well permit application process. As such, a transaction or occurrence giving rise to Appellants cause of action for abuse of process - the sending of an objection letter and emails referencing the 2021 litigation against Appellants – occurred in Allegheny County. Therefore, Allegheny County was one of the venues in which the abuse of process cause of actions could have been filed.

**Conclusion**

For the reasons set forth herein, we find that the trial court erred as a matter of law in sustaining the Scotts' preliminary objection asserting improper venue and transferring this case to Greene County. Specifically, we conclude that venue in Allegheny County was proper on Appellants' breach of contract, negligent misrepresentation, and abuse of process claims. Consequently, we vacate the July 13, 2023 order that sustained the Scotts' preliminary objection regarding improper venue and transferred the case *sub judice* to the Court of Common Pleas of Greene County.

Order vacated. Case remanded for further proceedings in accordance with this opinion. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 9/4/2024